**EXHIBIT 1**

2 CITS-ESERVE

Case 3:20-cv-01348-D   Document 1-1   Filed 05/26/20   Page 2 of 21   PageID 8

FILED
4/23/2020 3:36 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

Cause No. ___DC-20-05999___

| | | |
|---|---|---|
| **VANDELAY HOSPITALITY GROUP LP D/B/A HUDSON HOUSE,** | § § § § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § § | |
| **v.** | § § | ___C-68___ **JUDICIAL DISTRICT** |
| **THE CINCINNATI INSURANCE COMPANY, AND BARON CASS,** | § § § § | |
| *Defendants.* | § | **DALLAS COUNTY, TEXAS** |

# ORIGINAL PETITION & REQUEST FOR DISCLOSURE

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW,** Plaintiff Vandelay Hospitality Group LP d/b/a Hudson House, who files this Original Petition & Request for Disclosure against The Cincinnati Insurance Company and Baron Cass over Cincinnati's anticipated refusal to provide insurance coverage, and would respectively show this Court the following:

## I.    PARTIES

1.      **Plaintiff Vandelay Hospitality Group LP d/b/a Hudson House** ("Vandelay" and/or "Plaintiff") is a Texas Limited Partnership doing business in Dallas, Texas.

2.      **Defendant The Cincinnati Insurance Company** ("Cincinnati" and/or "Defendant") is in the business of insurance in the State of Texas with a certificate of authority to engage in the business of insurance in the State of Texas. Defendant is incorporated in the State of Ohio, and maintains its principal place of business in Ohio. It may be served with process by delivering a copy of the Complaint and Summons to its

---

Registered Agent, CT Corporation System, 350 North St. Paul St., Dallas, Texas 75201

National Registered Agents, Inc., at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136, or wherever else it may be found.

3.        **Defendant Baron Cass** ("Cass") is Plaintiff's insurance broker. Mr. Cass is an individual residing in Dallas County, Texas, and may be served at his place of employment, Swingle Collins & Associates, 13760 Noel Road, Ste. 600, Dallas Texas 75240.

## II.        JURISDICTION & VENUE

4.        Jurisdiction is proper in this Court as the relief requested falls within the jurisdictional limits of the Court.  Venue is proper in Dallas County, Texas, pursuant to Chapter 15 of the Texas Civil Practice and Remedies Code because, among other reasons, all or a substantial portion, of the events involved in this lawsuit occurred in Dallas County, Texas as well as TEX. BUS. & COM. CODE § 17.56.

5.        This Court has jurisdiction to grant declaratory relief under Chapter 37 of the Texas Civil Practice and Remedies Code because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the loss of business arising from the civil authority events detailed below.

6.        This Court has personal jurisdiction over Defendant Cincinnati pursuant to the Texas long arm statute because Cincinnati has submitted to jurisdiction in this state by transacting business in Texas, contracting to insure a person, property or risk located in Texas at the time of contracting and making a contract substantially connected with Texas. Cincinnati's business includes but is not limited to: (a) making and issuing insurance contracts with the Plaintiff and Texas residents similar to the Plaintiff; (b) taking or receiving applications for insurance from Texas residents including the

Plaintiff's application; (c) receiving or collecting premiums, commissions, membership fees, assessments, dues or other consideration for any insurance or any part thereof, including any such consideration or payments from the Plaintiff; and, (d) the issuance or delivery of contracts of insurance to residents of the State of Texas or person authorized to do business in the State of Texas, including the Plaintiff. In addition, Defendant Cincinnati exercises substantial, systematic, and continuous contacts with Texas by doing business in Texas, serving insureds in Texas, and seeking additional business in Texas.

7.      Pursuant to TEX. R. CIV. P. 47, the Plaintiff seeks monetary relief against Cincinnati for more than $1,000,000.00.[1]

### III.    <u>INTRODUCTION</u>

8.      Plaintiff is the owner and operator of several restaurants in Dallas who have been forced to cease its full-service operations as a result of physical damage to Plaintiff's business property, including its equipment and fixtures; as confirmed by recent orders issued by the City of Dallas and the State of Texas, to cease its full-service operations – through no fault of its own – as part of the City and State's effort to slow the spread of the COVID-19 global pandemic.

9.      The limitations caused by the physical damage, and as mandated by these orders, present an existential threat to Plaintiff and to other small, local businesses that employ hundreds of Dallas residents. To protect its restaurants from situations like these, which threaten its livelihoods based on factors wholly outside of its control, Plaintiff obtained, through Cincinnati's registered broker Cass, business interruption insurance from Cincinnati.

---

[1]Plaintiff reserves the right to amend, decrease and/or increase the amount of damages plead based on evidence developed before trial.

10.     In blatant breach of its insurance obligations that it voluntary undertook in exchange for Plaintiff's premium payments, Cincinnati is anticipated and has indicated that Plaintiff's claims arising from the City and State-ordered interruption of its restaurants will be denied.  As a result, Plaintiff now brings this action to ensure Plaintiff's receipt of the benefits of the all-risk commercial business owner's insurance Policy issued to Plaintiff, which provides for coverage for losses incurred due to a "necessary suspension" of its operations, including when its businesses are forced to close due to a government order.

### IV.     FACTUAL ALLEGATIONS

11.     In exchange for substantial premiums, Cincinnati sold a commercial property insurance policy promising to indemnify Vandelay for losses resulting from occurrences, including the necessary suspension of business operation at any insured location caused by a government order, during the relevant time period (hereinafter the "Policy").  Vandelay purchased the Cincinnati's commercial Policy through Cincinnati's registered insurance broker, Cass.

12.     The Policy is an "all risk" policy that provides broad coverage for losses caused by any cause unless expressly excluded.

13.     The Policy insures three (3) of Vandelay's restaurants, two (2) Hudson House locations and Drake's Hollywood (sometimes collectively referred to as "Insured Restaurants" and/or "Restaurants").

14.     To protect its Restaurants from mandatory closures, Vandelay obtained business interruption insurance from Cincinnati through its registered broker, Cass.  The Policy is to pay for loss of business income and extra expenses caused by action of civil authority that prohibits access to the premises due to "loss" to property.

15.      The Insured Restaurants are covered under Cincinnati Policy ECP0495629, which is effective from July 6, 2019 through July 6, 2020. The Policy has been continuously in full force and effect since inception.

**Coronavirus (COVID-19) and Dallas' & Texas' Response**

16.      For years, if not decades, the Center for Disease Control and the World Health Organization ("WHO") have been warning about the possibility of an airborne virus that could cause a worldwide pandemic. Coronavirus (COVID-19) (hereinafter "COVID-19") is a highly contagious airborne virus that has rapidly spread and continues to spread across the United States.  On January 30, 2020, the Director of WHO declared the 2019 Coronavirus "outbreak a Public Health Emergency of International Concern."

17.      On March 11, 2020, the WHO declared the CONVID-19 virus outbreak a pandemic (a widespread epidemic).

18.      The following day, on March 12, 2020, a Declaration of State of Disaster was issued by Texas Governor Abbot to take additional steps to prepare for, respond to, and mitigate the spread of SARS-CoV-2.

19.      That same day on March 12, 2020, the Mayor of Dallas "declared a local state of disaster" for the City of Dallas resulting "from the COVID-19 Pandemic" and issued an Order prohibiting public gatherings of more than 500 people.

20.      On March 12, 2020, Dallas County Judge Clay Jenkins, under the authority of Texas Government Code section 108, issued a DECLARATION OF LOCAL DISASTER FOR PUBLIC HEALTH EMERGENCY. The Declaration stated that "a local state of disaster for public health emergency is hereby declared for Dallas County, Texas, pursuant to Section 418.108(a) of the Texas Government Code.

21.      Judge Jenkins also issued an order on March 12, 2020 stating:

> The virus that causes 2019 Coronavirus Disease (COVID-19) is easily transmitted through person to person contact, especially in group settings, and it is essential that the spread of the virus be slowed to protect the ability of public and private health care providers to handle the influx of new patients and safeguard public health and safety.

22.     On March 16, 2020, President Trump acknowledged the gravity of the COVID-19 pandemic and introduced new guidelines to limit people's interactions, including that all Americans should avoid groups of more than 10 people.

23.     On March 16, 2020, Dallas County issued an Amended Order that barred public, private or community gatherings of more than fifty (50) persons. It also provided that: "Restaurants with or without drive-in or drive-through services and microbreweries, micro-distilleries, or wineries may only provide take out, delivery, or drive-through services as allowed by law."

24.     The City of Dallas also issued an Amended Order on March 16, 2020 prohibiting access and use of any premises operated as dine-in restaurants, but allowing operation only as regulated take-out services. The Amended Dallas City Order further provided that "[t]he owner, manager, or operator of any facility that is likely to be impaired by these regulations shall post a copy of these regulations onsite and visible to users of the facility and provide a copy to any user of the facility asking for a copy." Dallas County issued another Amended Order, which prohibited "[p]ublic or private Recreational Gatherings and Community Gatherings." It further ordered that "[b]ars, lounges, taverns, private clubs, arcades, and gyms shall close."

25.     Effective on March 17, 2020, and in accordance with public health recommendations and directives coming from federal, state and county officials, Plaintiff announced it would be closing all Restaurant locations until the appropriate authorities determined the danger from the COVID-19 pandemic has passed and it is safe to reopen.

26.     Any debate over whether or not Plaintiff was required to temporarily close all of its Texas Restaurant locations was quashed when, on March 19, 2020, Texas Governor Abbott issued a Public Health Disaster Declaration and Executive Order that, among other things, prohibited Texans from gathering in groups of ten or more people, which constructively closed all of Plaintiff's Restaurants.

27.     That same day, the Texas Commissioner of the Department of the State Health Services issued a proclamation, pursuant to Texas Health and Safety Code § 81.002, which (1) declared a public health disaster for the entire State of Texas; and then (2) ordered that everyone in Texas "shall act responsibly to prevent and control communicable disease."

28.     The Order then listed several standards of responsible action to "reduce and delay the spread of COVID-19," including:

- "Limit as much as possible close contact with other people. Stay six feet away."

- "Do not gather in social groups of more than ten (10) individuals."

- "Limit trips into the public to essential outings. Traveling to work, the grocery store, the pharmacy or to seek medical care would be considered essential trips."

- "Restaurants should not allow dine-in options, either inside or outside."

29.     Dallas County issued another Amended Order requiring those living in Dallas County to shelter at their residence, effective at 12 a.m. March 24, 2020. It allowed only essential businesses to continue to operate.

30.      Dallas County issued a subsequent Amended Order continuing the extraordinary rules and regulations previously adopted, and amended the previous Order stating:

> WHEREAS, this Emergency Order is necessary because of the propensity of the virus to spread to person to person and also because ***the virus is physically causing property damage*** due to its proclivity to attach surfaces for prolonged periods of time;

> WHEREAS, this Emergency Order is necessary to protect the lives, health, welfare, and safety of the County's residents from the devastating impacts of this pandemic.
> . . . .

31.      The Amended Dallas County Order further provides as to Restaurants:

> Restaurants. Restaurants with or without drive-in or drive-through services and microbreweries, micro-distilleries, or wineries may only provide take out, delivery or drive-through services as allowed by law. ***In-person service is prohibited.*** Customers may order and pay inside, but are prohibited from waiting inside the restaurant for their food. All food must be brought outside to customers. To allow for increased access to restaurants, this Order hereby suspends all laws and regulations prohibiting people from walking in a drive-through.

## Cincinnati Anticipatorily Repudiates Plaintiff's Insurance Coverage

32.      On March 17, 2020, Plaintiff through Cass, provided a notice of claim under the Policy to Cincinnati's agent for notice of claims.

33.      On March 23, 2020, Cincinnati's agent submitted a reservation of rights letter to Plaintiff, which clearly indicated Cincinnati's position of no coverage.   For example, Cincinnati states:

> At the threshold, there must be direct physical loss or damage to Covered Property caused by a covered cause of loss in order for the claim to be covered. Covered Property generally entails your premises and business personal property. Direct physical loss or damage generally means a physical effect on Covered Property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect. Your notice of claim indicates that your claims involves Coronavirus.

However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises.

34.     Although Plaintiff has yet to receive a formal denial of coverage, the above statement from Cincinnati's agent is clear: Cincinnati has no intention of providing coverage under its Policy.

**Plaintiff's All-Risk Insurance Policy**

35.     At all relevant times hereto, Plaintiff was an insured under the Policy. At all times mentioned herein, the Policy covered the Restaurants/Premises identified above. Plaintiff intended to purchase, and did in fact purchase, an exclusionary policy, intending to cover, among other things, all business interruptions caused by any event other than those specifically excluded in the Policy.

36.     Plaintiff has performed all of their obligations under the Policy, including but not limited to the payment of premiums and timely reporting of claims. Therefore, the Policy has been in effect since July 6, 2019 without interruption.

37.     The Policy pays for direct physical loss to the covered Restaurants as well as business income and extra expenses incurred due to the necessary suspension of operations. The Policy also pays for losses incurred as a result of business interruption caused by an order from a civil authority.

38.     Cincinnati's conclusory position that the COVID-19 does not constitute direct physical damage, and thus no coverage exists Plaintiff's forced closures and business interruption is not supported by the Policy, or the facts.

39.     Direct physical loss can exist without actual structural damage to property. In analogous circumstances to the COVID-19 agent, the presence of harmful substances at or on a property can constitute property damage or direct physical loss that triggers

first party property damage. For instance, ammonia accidentally released into a facility, renders the building unsafe until it can be removed: covered property damage has occurred. If the presence of harmful substances renders the property uninhabitable or unstable, the coverage requirement of direct physical loss as a necessary condition has been met. It has consistently been held that the presence of a dangerous substance in a property constitutes "physical loss or damage."

40.      At the very least, Plaintiff suffered a physical loss of the covered property as a result of the COVID-19 coronavirus and the mandated orders and actions taken to limit the impact of the pandemic.

41.      Plaintiff clearly suffered a loss of use of covered property because Plaintiff was unable to operate and use the restaurant for in-person dining.

42.      Moreover, unlike many commercial property policies available in the market, the Policy sold by Cincinnati do not include an exclusion for loss caused by a virus. The Policy has rules and conditions regarding bacteria, but it is undisputed that a virus is not a bacterium.

43.      Indeed, the insurance industry has promulgated forms that recognize the distinction between viruses an bacterium and, when applicable, provide for the exclusion of both.  One such promulgated form provides:

COMMERCIAL PROPERTY
CP 01 40 07 06

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

1. Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

2. Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

44.     Plaintiff reasonably believed and expected that the insurance purchased from Cincinnati included coverage for property damage and business interruption losses caused by viruses like the COVID-19 coronavirus.

45.     Had Cincinnati wanted to exclude pandemic-related losses under the Policy, it easily could have attempted to do so on the front-end with an express exclusion. Instead, Cincinnati collected substantial premiums, and after a pandemic and the resulting closure orders caused catastrophic business losses to Plaintiff to try to limit its exposure on the backend through its erroneous assertion that the presence of the COVID-19 is not a physical loss and thus is not a covered cause of loss under the Policy.

46.     Plaintiff brings this lawsuit against Defendants for declaratory relief, and against Cincinnati for its anticipatory breach of its contractual obligations under the all-risk commercial property insurance Policy to indemnify Plaintiff for business losses and

extra expenses, and other related losses resulting from the actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 outbreak.

## V.   CAUSES OF ACTION

47.     All conditions precedent to this action have been performed, have been waived or are excused.

48.     The acts and omissions of Defendants described in the foregoing paragraphs give rise to the following causes of action:

**DECLARATORY JUDGMENT OF COVERAGE**

49.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

50.     This Court may declare the rights and other legal relations of the parties in dispute whether or not further relief is or could be sought.

51.     An actual and bona-fide controversy exists between the Plaintiff and Defendants[2] as the rights and obligations under the Policy coverage for business income loss in that:

    a.     Plaintiff was forced to close the insured Restaurants' premises or substantially reduce its business due to the measures put in place by civil authorities to stop the spread of COVID-19, specifically through human to human and surface to human contact.

---

[2] Defendants are both proper parties to this declaratory judgment action because both Defendants could be impacted by a determination that the Policy sold to Plaintiff does not in fact provide the coverages that Plaintiff sought and believed it acquired.

b.      Plaintiff contends that these measures trigger coverage under the all-risk Policy because the Policy does not include an exclusion for a viral pandemic;

c.      Plaintiff further contends these civil authority Orders triggers coverage under the all-risk Policy because there was a direct loss of property;

d.      Upon information and belief, Defendant denies and disputes that the standard business income loss and extra expense coverage Policy provides coverage in this instance.

52.      Plaintiff seeks a declaration that the Policy is an all-risk commercial property insurance Policy and that it provides coverage for business income losses and extra expenses.

53.      Plaintiff also seeks a declaration that the forced closures of the insured Restaurants' premises from state and local authorities is a prohibition of access to their premises and covered as defined in the Policy.

54.      Plaintiff also seeks a declaration by this Court that Plaintiff sustained a "direct loss to property" because of COVID-19 and the Orders issued from state and local authorities.

55.      Plaintiff seeks an additional declaration that the lost business income it sustained and continues to sustain is due to the necessary "suspension of [their] operations" following a loss of the premises.

56.      This Court has the power and authority to determine the existence or non-existence of any right, duty, power, liability, privilege, or any fact upon which the parties' legal relations depend.

57.     The declaration sought with regard to the instant controversy is of a justiciable nature, does not amount to an advisory decree, and will settle the controversy between the parties.

**BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION**

58.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

59.     Vandelay and Cincinnati have a valid agreement.  Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

60.     Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due.

61.     The Policy provides for coverage for losses to business income and for extra expenses.

62.     The Policy provides that the Cincinnati will pay for the actual loss of business income due to the necessary suspension of operations.

63.     The Policy also provides that the Cincinnati will pay for any necessary expenses that Plaintiff incurs that it would not have occurred had there been no loss of the insured property.

64.     Plaintiff's all-risk commercial insurance Policy provides for coverage for suspension of business operations due to closures caused by the action of civil authorities.

65.     As stated above, Plaintiff was forced to close its premises to the public and cease or substantially reduce its operations due to the measures put in place by civil authorities to stop the spread of COVID-19 through human to human and surface to human transmission.

66.     Upon information and belief, Cincinnati intends to refuse performance under the Policy. Specifically, Cincinnati intends to deny ore refuse to provide coverage for loss of property, business income losses or extra expenses incurred due to the measures put in place by civil authorities to stop the spread of COVID-19.

67.     As a result of Cincinnati's repudiation or anticipatory breach of the insurance Policy, Plaintiff has suffered actual damages.

68.     Plaintiff seek compensatory damages resulting from the Cincinnati's repudiation or anticipatory breach of contract, and further seek relief deemed appropriate by this Court, including attorneys' fees and costs.

## Breach of Good Faith and Fair Dealing

69.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

70.     Defendant's conduct constitutes a breach of the common-law duty of good faith and fair dealing owed to insured in insurance contracts.

71.     "Good faith and fair dealing" is defined as the degree and diligence which a man of ordinary care and prudence would exercise in the management of one's own business.

72.     This tort arises from Texas law, which recognizes that a special relationship exists as a result of the unequal bargaining power between Plaintiff (the policyholder) and Cincinnati (the insurer).

73.     Part of this unequal bargaining power results from the fact that Cincinnati, like other insurers, controls entirely the evaluation, processing and denial of claims.

74.     By immediately refuting coverage by claiming that COVID-19 does not result in direct property loss, Cincinnati is attempting to vary the term loss.

75.     Cincinnati's conduct appears to be nothing more than an attempt to put insured in a position where they will be forced to accept lowball settlement offers simply from the fear that their insurer will drag out proceedings well past the insured's ability to remain financially viable.

76.     On information and belief, Cincinnati's anticipated denial of coverage is based on an internal, high-level directive to automatically deny all pandemic-related business-interruption claims.  Cincinnati's reservation of rights and anticipated denial of coverage is unreasonable and reflects a failure to adequately and reasonably investigate and evaluate Plaintiff's claim, even though Cincinnati knew, or should have known by the exercise of reasonable diligence that its liability was reasonably clear under the circumstances.  For these reasons, Cincinnati's conduct described herein constitutes a breach of the duty of good faith and fair dealing.

77.     Plaintiff is entitled, at a minimum, to all compensatory damages, including all forms of loss resulting from Cincinnati's breach of duty, such as additional costs, economic hardship, losses due to nonpayment of the amount Cincinnati owes, and other direct and consequential damages, as well as exemplary damages.

**Violation of Texas Prompt Pay Act**

78.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

79.     Cincinnati has failed to timely and promptly pay as required under Tex. Ins. Code §§ 542.055-542.059.

80.     Cincinnati should be ordered to pay "in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable and necessary attorney's fees. Nothing in this subsection prevents the

award of prejudgment interest on the amount of the claim, as provided by law. Tex. Ins. Code § 542.060(a)

81.     Plaintiff was forced to retain the services of an attorney and law firm to represent it with respect to its claims against Cincinnati because of Cincinnati's wrongful acts or omissions. Tex. Ins. Code § 542.060(b).

### Violation of the Texas Insurance Code §541.061, §542.057-58, §542.060

82.     Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

83.     The Texas Insurance Code Chapter 541 sets out Unfair Methods of Competition, Unfair or Deceptive Acts or Practices that insurance companies should not engage in, as well as Unfair Settlement Practices, which includes things like: misrepresenting a material fact or policy provision; failing to attempt in good faith to effect a prompt, fair and equitable settlement where the insurer's liability has become reasonably clear; failing to provide a policyholder with a reasonable explanation of why a claim was denied or offer of compromise; and refusing to pay a claim without conducting a reasonable investigation.

84.     Cincinnati has failed and continues to fail and refuse to meet its obligations under the Texas Insurance Code regarding payment of claims without delay due to its wrongful denial.

85.     Cincinnati's conduct constitutes a violation of the Texas Insurance Code §542.057-58. Cincinnati's actions have damaged Vandelay in excess of the jurisdictional limits of this Court.

86.     Furthermore, for Cincinnati's noncompliance with the Texas Insurance Code, Unfair Settlement Practices, Vandelay is entitled to actual damages, which include the loss of the benefits that should have been paid pursuant to the Policy but for the wrongful denial, court costs, consequential damages not covered by Vandelay's Policy and attorney's fees. For knowing conduct of the acts described above, Vandelay seeks three (3) times the actual damages against Cincinnati. TEX. INS. CODE §541.152.

## VI.      ATTORNEYS' FEES

87.     Plaintiff is entitled to recover its court costs and attorneys' fees in accordance with TEX. CIV. PRAC. & REM. CODE §§ 37.004, 37.005, 37.009, TEX. CIV. PRAC. & REM. CODE § 38.001 and TEX. INS. CODE §542.060

## VII.      EXEMPLARY DAMAGES

88.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

89.     The acts of Cincinnati complained of herein were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice.  In order to punish Cincinnati for such unconscionable overreaching and to deter such actions and/or omissions in the future, Vandelay seeks recovery from Cincinnati of exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code and TEX. INS. CODE §542.060.

## VIII.  REQUESTS FOR DISCLOSURE

90.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Cincinnati is hereby requested to disclose the information or material described in Rule 194.2.  This is

a continuing duty and requires supplementation in accordance with the Texas Rules of Civil Procedure.

## NO WAIVER

91.     By filing this lawsuit, Vandelay does not waive or release any rights, claims, causes of action, or defenses or make any election of remedies that it has, but expressly reserve such rights, claims, causes of action and defenses.

## CONDITIONS PRECEDENT

92.     All conditions precedent to Vandelay's right to recovery has been performed, have occurred, and/or have been waived.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Vandelay Hospitality Group LP request that Defendants The Cincinnati Insurance Company and Baron Cass be cited to appear and answer, and that declaratory judgment be entered in Plaintiff's favor as stated herein, and that Plaintiff have judgment against Defendant The Cincinnati Insurance Company for all actual, consequential and special damages, as  well as exemplary damages, and that the Plaintiff recover its attorney's fees, costs of court, and all such other relief, general or special, legal or equitable, to which Plaintiff may show itself justly entitled.

Respectfully Submitted,

  /s/ *Shauna A. Izadi*
**SHAUNA A. IZADI**
Texas Bar No. 24041170
Email: sizadi@fflawoffice.com
Direct: 972-450-7331
**JASON H. FRIEDMAN**
Texas Bar No. 24059784
Email: jason@fflawoffice.com
Direct: 972.450.7339

**FRIEDMAN & FEIGER LLP**
5301 Spring Valley, Suite 200
Dallas, Texas 75254