## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| VANDELAY HOSPITALITY GROUP LLC D/B/A HUDSON HOUSE., | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:20-CV-01348-D |
| THE CINCINNATI INSURANCE COMPANY, BARON CASS AND SWINGLE COLLINS COMPANY, LLC | § § § § § | |
| Defendant. | § § | |

---

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS OPPOSITION TO THE CINCINNATI INSURANCE COMPANY'S MOTION TO DISMISS**

---

Respectfully submitted,
**FRIEDMAN & FEIGER, L.L.P.**

By:   /s/ *Shauna A. Izadi*
　　　―――――――――――――――
　　　**SHAUNA A. IZADI**
　　　State Bar No. 24041170
　　　Email: sizadi@fflawoffice.com
　　　**JASON H. FRIEDMAN**
　　　State Bar No. 24059784
　　　Email: jason@fflawoffice.com
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

**ATTORNEYS FOR PLAINTIFF**

| TABLE OF CONTENTS |
| --- |

I.      **INTRODUCTION & SUMMARY OF ARGUMENT**.....................................................1

II.     **FACTUAL BACKGROUND**.........................................................................................3

    A. **Procedural Background** ................................................................................4

III.    **ARGUMENTS & AUTHORITIES** .............................................................................5

    A. **12(b)(6) Standard** .........................................................................................5

    B. **Plaintiff has met its burden to establish Direct Physical Loss** ................6

        i. **COVID-19 Constitutes "direct physical loss" to the property** .....................6

            a. **COVID-19 is a "disaster," which coverage under an all-risk policy should be expected** .......................................................................6

            b. **"Physical loss or damage" is not limited to structural loss** .........................................................................................................8

            c. **A Property's unsuitability for an intended purpose constitutes "physical loss or damage"** ..................................15

            d. **Both Contamination and Suspected Contamination Cause "Physical loss or damage"** .........................................16

        ii. **Cincinnati Insurance Company cannot meet its burden to establish an exclusion** ........................................................................18

    C. **Plaintiff Has Plead Sufficient Facts to Survive on Its Breach of Good Faith and Fair Dealing Claim** ..................................................................20

    D. **Plaintiff Has Stated a Sufficient Claim for Civil Authority Coverage** ....................................................................................................22

    E. **Vandelay's Texas Insurance Claims Survive Cincinnati's Motion to Dismiss** ......................................................................................................23

    F. **Vandelay Properly Please Prompt Payment Act** ....................................25

V.      **CONCLUSION** ..........................................................................................................25

    **CERTIFICATE OF SERVICE** .......................................................................................26

| TABLE OF AUTHORITIES |
| --- |

*Aetna Cas. and Sur. Co. v. Yates,*
344 F.2d 939 (5th Cir. 1965). ……………………………….........................................12

*Admiral Ins. Co. v. Ford,*
607 F.3d 420,  (5th Cir. 2010). …………………………….....................................20

*Am. All Ins. Co. v. Keleket X-Ray Corp.,*
248 F.2d 920,  (6th Cir. 1957) ……………………….....................................................17

*Arnold v. Nat'l Cty. Mut. Fore Ins. Co.,*
725 S.W.2d 165,  (Tex. 1987) ………………….....................................................20

*Ashcroft v. Iqbal,*
556 U.S. 662,  129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)……………………………………....5

*Azalea Ltd. v. American States Ins. Co.,*
656 So.2d 600 (Fla. 1st DCA 1995)……………………………………………...……11, 13, 14

*Barnett v. Aetna Life Ins. Co.,*
723 SW2d 663, (Tex. 1987) ………………………………………………………………19

*Bd. Of Educ. Of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.,*
720 N.E.2d 622,  (Ill. Ct. App. 1999), as modified on denial of reh'g (Dec. 3, 1999)……..14

*Bell Atl. Corp v. Twombly*
550 U.S. 544,  127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)……………………………….……..5

*Cook v. Allstate Ins. Co.,*
Case No. 48D02-0611-PL-01156  (Ind. Super. Nov. 30, 2007). ………………….……….....16

*Cooper v. Travelers Indemnity Co. of Ill,*
Case No. 01-2400, 2002 WL 32775680 (N.D. Cal. Nov, 4, 2002)…………………………10, 16

*Dow Chem. Co. v. Royal Indem. Co.,*
635 F.2d 379,  (5th Cir. 1981)……………………………………………………….7, 12, 18-20

*Dundee Mut. Ins. Co. v. Marifjeren*
587 N.W.2d 191, (N.D. 1998)…………………………………………………….....…11

*Essex v. BloomSouth Flooring Corp.,*
562 F.3d 399,  (1st Cir. 2009)..…………………………………………………..……….12

*Foremost Ins. Co. v. Medders,*
399 So.2d 128,  (Fla. 5th DCA 1981)…………………………………………………....11

*Friends of DeVito et al. v. Tom Wolf, Governor et. al.*
227 A.3d 872,  (Penn. April 13, 2020)………………………………………….........7, 17

*Garcia v. Dep't of Soc. & Health Servs.,*
10 Wn. App. 2d 885, 451 P.3d 1107 (2019)……………………………………….…....11

*Glover v. Nat'l Ins. Underwriters,*
545 S.W.2d 755 (Tex. 1977) )…………………………………………………………..12

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Of Am.,*
No. 2:12-CV-04418, 2014 WL 6675934,  (D. N.J. Nov. 25, 2014) …………….………13, 16

*Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.,*
787 F.2 349,  (8th Cir. 1986) …………………………………………….…………………18
..
*Homeowners Choice Prop. & Cas. V. Maspons*
211 So.3d 1067,  (Fla. 3d DCA 2017)…………………………………….………....9-10

*Hughes v. Potomac Ins. Co.,*
18 Cal. Rptr. 650,  (Cal. Dist. Ct. App. 1962) …………………………….………14

*Jaramillo v. Liberty Mut. Ins. Co.,*
No. 4:18-CV-00338-Y, 2019 WL 8223608, (N.D. Tex. Apr. 29, 2019) ………………..………21

*Lormand v. U.S. Unwrited, Inc.*
565 F.3d 228,  (5th Cir.2008) …………………………….………………………………5-.6

*Lowrey v. Texas A&M Univ. Sys,*
117 F.3d 242, 247 (5th Cir.1997) …………………………….…………………………5-6

*Matzner v. Seaco Ins. Co.,*
Case No. 96-0498, 1998 WL 566658 (Mass. Super. Aug. 26, 1998) …………….…………15

*Mellin v. Northern Security Ins. Co.,*
115 A.3d 799,  (N.H. 2015)……………………………………………………9, 12, 14

*Miles v. Royal Indem. Co.,*
589 S.W.2d 725,  (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.) …………….……18

*Mission Toxicology, LLC. V. United Healthcare Ins. Co.,,*
2018 WL 2222854,  (W.D. Tex. Apr. 20, 2018)……….……………………………….....6

*Morrison Grain Co. v. Utica Mut. Ins. Co.,*
632 F.2d 424,  (5th Cir. 1980) …………………………………………………………18

*Motorist Mut. Ins Co. v. Hardinger,*
131 Fed. Appx. 823 (3d Cir. 2005)……………………………………………………10, 13

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.,*
811 S.W.2d 552, ……………………………………………………………....……19

*Pawtucket Mut. Ins. Co. v. Hartford Ins. Co.,*
787 A.2d 870 (N.H. 2001)………………………………………………………............9

*Pillsbury Co. v. Underwriters at Lloyds,*
705 F. Supp. 1396,  (D. Minn. 1989) ……………………………………….....................16

*Port Auth. V. Affiliated FM Ins., Co.,*
311 F.3d 226,  (3d Cir. 2002) ………………………………………………………..17

*Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts,*
Case No. 01-cv-1362, 2002 WL 31495830  (D. Or. June 18, 2002). ………………….……15-16

*Ramsay v. Maryland Am. General Ins. Co.,*
533 S.W.2d 344, (Tex. 1976)……………………………………………………….……12, 19

*Schlamm Stone & Dolan LLP v. Seneca Ins. Co.,*
800 N.Y.S.2d 356 (N.Y. Sup. Ct. 2005) ………………………………………………17

*Sentinel Mgmt. Co. v. New Hampshire Ins. Co.,*
563 N.W.2d 296, 300 (Minn. Ct. App. 1997) ………………………………………..……14

*SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's London,*
179 S.W.3d 619,  (Tex. App. – Houston [1st Dist.] 2005, pet. denied) ………………….……18

*Snyder Nat'l Bank v. Westchester Fire Ins. Co.,*
425 F.2d 849 (5th Cir. 1970) ……………………………………………………..…....12

*Sullivan v. Leor Energy, LLC*
600 F.3d 542, 546( 5th Cir.2010)………………………………………………………....5

*TRAVCO Ins. Co. v. Ward,*
715 F. Supp. 2d 699,  (E.D. Va. 2010), *aff'd* 504 F. App'x 251 (4th Cir. 2013) ………………13

*Universe Life Ins. v. Giles,*
950 S.W.2d 48, (Tex. 1997) …………………………………………………….………21

*USAA Texas Lloyds Company v. Menchaca,*
2017 Tex. LEXIS 361, 60 Tex. Sup. Ct. J. 672, 2017 WL 1311752,  (Tex. 2017) …………..…20

*Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.,*
141 S.W.3d 198, (Tex. 2004)……………..…………………………………….………20

*Viles v. Security Nat'l Ins. Co.,*
788 S.W.2d 566,  (Tex. 1990) …………..………………………………………….......21

*Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.,*
968 A.2d 724,  (N.J. Super. Ct. App. Div 2009)……………………………………………..13

*Western Fire Ins. Co. v. First Presbyterian Church,*
437 P.2d 52,  (Colo. 1968) …………………………………………………….....13, 15

## **Statutes**

Federal Rules of Civil Procedure 12(b)(6) ……………………………………………5

Texas Government Code § 418.014……………………………………..……….....7

Texas Government Code § 418.005……………………………………..……….....7

Texas Ins. Code §  542.056(c) ………………………………………………….25

TEX. INS. CODE ANN. § 542.056(c) ………………………………………….……..…27

Tex. Ins. Code  §§ 542.051, 542.055, 542.056, 542.058, 542.060………………………25

## **References**

2 *Shorter Oxford English Dictionary* 2194 (6th ed. 2007) ………………………………....9

Black's Law Dictionary  389 (6th ed 1990) ……………………………………….....11

Merriam-Webster, https://www.merriam-webster.com/dictionary/loss .......................................11

Random  House  Dictionary of the English Language , 504 (2nd ed. 1987) ..............................11

Webster's New World Dictionary 256 (2nd ed. 1980) …………………………………..11

**COMES NOW** Plaintiff Vandelay Hospitality Group LLC d/b/a Hudson House (**"Plaintiff"** and/or **"Vandelay"**), by and through its counsel of record, and files its Brief in Support of its Opposition to The Cincinnati Insurance Company's ("**Cincinnati**") Motion to Dismiss, and in support thereof, would show the Honorable Court the following:

## I.      INTRODUCTION & SUMMARY OF ARGUMENT

Plaintiff's insurance commercial policy is an "all risk" policy that broadly covers loss resulting from any kind of "physical loss or damage" unless otherwise excluded *in writing*. Here, no applicable exclusion exists, such as in other policies for loss from "virus." This presents the threshold question of whether COVID-19 constitutes "physical loss or damage" within the meaning of this widely-used coverage grant. This is precisely what Plaintiff has alleged, and which must be taken as true at this stage in this case:  that the referenced Civil Orders due to COVID-19 forced Plaintiff's restaurants to "close" and the governmental suspension of business had a devastating effect on Plaintiff's restaurants, causing covered business interruption and physical loss.  In March of 2020, the State of Texas and City of Dallas issued a Declaration of Local Disaster for Public Health Emergency, and ordered that restaurants close as a result of COVID-19 global pandemic. Dallas County declared unambiguously and expressly, that it was closing the restaurants because the county determined that "the virus is physically causing property damage…" As a result of COVID-19, and the emergency orders, Plaintiff not only suffered a loss, but it also caused physical property damages to the Plaintiff's insured locations.

As a result of the government Orders and the COVID-19 virus, Plaintiff suffered losses covered by the Policy, including, but not limited to the COVID-19 virus attaching to the surfaces of the insured's locations for prolonged periods of time, physical contamination of the entire insured premises, the COVID-19 virus infecting Plaintiff's employees as well as Plaintiff's

customers, which all constitute a physical loss. Cincinnati, on the other hand, compares COVID-19 to mere dust, or otherwise dismisses it as something ephemeral in the air that has no physical impact on a "structure." But COVID-19 is neither ghostly nor intangible – it is real and it is physical – and tragically, ubiquitous and constantly shifting. And here, Plaintiff's restaurant interruption and closure is indisputably a "physical loss" event. Patrons were prohibited to venture inside the restaurant because it was physically dangerous, which is why the relevant Civil Orders were issued, effectively shutting down Plaintiff's restaurants. Cincinnati simply attempts to ignore the core fact of the case that must be taken as true at the pleading stage: as a direct result of COVID-19 (a physical thing) and the related Civil Orders, Plaintiff has lost the physical use of its restaurant, resulting in a significant loss of business income.

Cincinnati's position that the presence of the virus cannot constitute physical loss is undermined by both the terms of the Policy sold, and the terms of the Policy that could have been sold. The insurance industry has readily accepted and recognized this fact, having promulgated forms for business loss insurance that include both bacteria and viruses in the same exclusionary endorsement. If, as Cincinnati posits, the presence of bacteria and viruses could never result in "physical loss or damage," then there would be no need for Cincinnati and others to promulgate, much less sell, policies with endorsements that specifically exclude them from the scope of coverage on a policy that insures against just that, "physical loss or damage." The Court cannot assume that Cincinnati, and other insurers, are promulgating and selling policies with endorsements that specifically exclude losses or damages that are not covered in the first place. If bacteria or viruses could not cause "physical damage or loss," there would be no reason to specifically exclude it. This is what Cincinnati would have this Court determine.

Moreover, Cincinnati's assertion ignores the fact that its Policy promised to provide coverage for losses incurred due to government actions "taken in response to dangerous physical conditions," even if those dangerous physical conditions cause damage to property at locations other than those insured under its Policy. Thus, Cincinnati's wholesale, cursory coverage denials and reservation of rights letters are arbitrary and unreasonable, and inconsistent with the facts and plain language of the issued Policy. These denials appear to be driven by Cincinnati's desire to preempt their own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate, as Cincinnati is obligated to do, a full and fair investigation of the claims and a careful review of the Policy it sold to Plaintiff in exchange for valuable premiums. As set forth herein, Plaintiff has plead sufficient facts to survive Cincinnati's Motion to Dismiss.

## II.     FACTUAL BACKGROUND

This lawsuit arises from Defendant Cincinnati's denial of insurance coverage under Plaintiff's all-risk insurance Policy ECP 049 56 29 that was in effect from July 6, 2019 through July 6, 2020 ("Policy").  Plaintiff purchased the Policy in exchange for substantial premiums, based, among other things, on Defendants' representations that the Policy was an "exclusionary" policy, providing coverage for all risks not expressly excepted, in writing, in the Policy and endorsements.  Plaintiff relied upon the representations made and Defendants sold this Policy to Plaintiff, promising to indemnify Plaintiff for losses resulting from occurrences, including the necessary suspension of business operation at any insured location caused by government order and, by virtue of the omission of a virus exclusion, by the COVID-19 virus.

The Policy covers three of Plaintiff's restaurants in Dallas, Texas. In March of 2020, the State of Texas and City of Dallas issued a Declaration of Local Disaster for Public Health Emergency, and ordered that restaurants close as a result of COVID-19 global pandemic. Dallas

County declared the order as necessary "because the virus is physically causing property damage…" As a result of COVID-19, and the emergency orders, Plaintiff not only suffered a loss, but it also caused physical property damages to the Plaintiff's insured locations. Plaintiff also suffered a loss and physical loss as a result of the government's suspension of the Plaintiff's business.   Despite Cincinnati's affirmative duty to investigate Plaintiff's claims under the Texas Insurance Code, Cincinnati issued an immediate, form, reservation of rights and failed to undertake any investigation of Plaintiff's claim.  Subsequently, perhaps realizing the breadth of the Policy and the coverage afforded, Cincinnati continued to refuse to conduct a reasonable investigation of the claim, but instead, requested that Plaintiff investigate its own claims; and provide the results of its investigation to Cincinnati.

The Policy at issue in this case does in fact contain an endorsement excluding coverage for bacteria.  It does not, however, include an exclusion for viruses, which is the subject of the instant case; although it certainly could have.  Plaintiff paid for a policy that did not exclude viruses, but only excluded bacteria, from the coverage of the Policy.  There is no basis to distinguish between the damage that bacteria causes to physical property, and the damage that a virus causes to physical property.  By failing to exclude the latter, the Policy must include coverage for it.

Plaintiff has alleged claims against Cincinnati for declaratory judgment, breach of contract, breach of good faith and fair dealing, violations of the Texas Prompt Pay Act, violations of the Texas Insurance Code. Plaintiff incorporates its allegations set forth in its live Petition. (Dkt. 1-6)

A.    **ProceduralBackground**

Plaintiff commenced this lawsuit on April 23, 2020 in Dallas County, Texas. (Dkt. 1-6). Plaintiff filed its First Amended Petition on May 21, 2020 naming Defendant Swingle as an additional defendant to the lawsuit.  (Dkt. 1-6, p.51). On or about May 26, 2020, after Swingle was

named in the lawsuit, Cincinnati, with knowledge that Swingle was named in the lawsuit, filed its Notice of Removal alleging diversity of the parties on the grounds that Barron Cass was fraudulently joined. (Dkt 1). Cincinnati simply ignored and omitted any reference to Swingle, another non-diverse party, and the claims asserted against it, from its Notice of Removal. Defendant Swingle was served on May 29, 2020.  Cincinnati filed its Amended Notice of Removal on June 9, 2020, and again, it failed to identify or plead Defendant Swingle's citizenship (or even mention Swingle except in the caption of the lawsuit). (Dkt. 11)  Pending before this Court is Plaintiff's Motion to Remand, and Plaintiff respectfully requests that this Court consider and rule on Plaintiff's Motion to Remand prior to ruling upon Cincinnati's Motion to Dismiss.

### III.    ARGUMENT & AUTHORITIES

#### A.    12(b)(6) Standard

Pursuant to Rule 12(b)(6), dismissal of an action is appropriate whenever the complaint, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts. *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir.2010). A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are  viewed  with  disfavor  and  are  rarely

granted. *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 232 (5th Cir.2009); *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997).

**B.**     **Plaintiff has met its burden to establish Direct Physical Loss**

Defendant should not prevail on its Motion to Dismiss because Plaintiff has met its burden to plead "enough facts to state a claim for relief that is plausible on its face." *Mission Toxicology, L.L.C. v. United Healthcare Ins. Co.*, 2018 WL 2222854, at *3 (W.D. Tex. Apr. 20, 2018).

In order to show a claim that is plausible on its face, Plaintiff must present sufficient facts to establish its plausible entitlement to coverage under the Policy. *See Id.* In other words, Plaintiff must show that Plaintiff's properties plausibly sustained "direct physical loss or damage" to entitle them to coverage under the Policy.

Plaintiff has met this burden as the presence, or even the apprehension of COVID-19 on the premises, would at least *plausibly* constitute "direct physical loss or damage" to the insured's premises. The burden then shifts to Cincinnati to establish that an exclusion in the policy applies, which it cannot do. Therefore, because Vandelay has plead sufficient facts to state a plausible claim on its face and Cincinnati has failed to carry its burden to establish an exclusion, Cincinnati's motion should be denied in its entirety.

**i.**     **COVID-19 constitutes "direct physical loss" to the property.**

The issue before this Court is simple: whether Plaintiff has met its burden to state a plausible claim that COVID-19 warrants coverage under the Policy. Coverage under the Policy is warranted when the peril results from "direct physical loss or damage" to the premises. [APP. 117] COVID-19 causes "direct physical loss" to the property because, among other things, COVID-19 has been declared a "disaster," and the all-risk Policy here covers such perils.

**a.**     **COVID-19 is a "disaster," which coverage under an all-risk policy should be expected.**

The presence of COVID-19 on the insured's premises, or even the apprehension of COVID-19's presence on the insured's premises, constitutes "direct physical loss or damage" because the area is affected by a disaster. Because all-risk policies such as the Policy at issue are expected to cover disasters, the presence of COVID-19 warrants coverage. *See Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 386 (5th Cir. 1981).

The Texas Governor himself declared COVID-19 as a "disaster." (Dkt. 1-6 ¶¶ 19-32). On June 26, 2020, Texas Governor Greg Abbott issued his Executive Order GA-28 and, in par with previous executive orders, regulated the operation of businesses during the COVID-19 pandemic. Governor Abbott's orders were issued pursuant to his authority under Texas Government Code Section 418.014 which states: "[t]he governor by executive order or proclamation may declare a state of disaster if the governor finds a **disaster** has occurred or that the occurrence or threat of disaster is imminent." Tex. Gov't Code § 418.014 (emphasis added). The Government Code defines "Disaster" as:

> **The occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property** resulting from any natural or man-made cause, including fire, flood, earthquake, wind, storm, wave cation, oil spill or other water contamination, volcanic activity, epidemic, air contamination, blight, drought, infestation, explosion, riot, hostile military or paramilitary action, extreme heat, cybersecurity event, or other public calamity requiring emergency action, or energy emergency.

*Id.* at § 418.005 (emphasis added).

Thus, the Governor of Texas derives his authority to issue these executive orders from the fact that COVID-19 is a "disaster," meaning that COVID-19 is the occurrence, or poses an imminent threat of widespread or severe damage, injury, or loss of life or property. *See Friends of DeVito et al. v. Tom Wolf, Governor et al.*, 227 A.3d 872, 889 (Penn. April 13, 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive

proportions. Its presence in and movement through Pennsylvania triggered the Governor's authority under the Emergency Code").

The Policy defines **"Occurrence"** as "all loss, damage, or a sequence or damage, casualties or disasters arising from a single happening or event." (APP. 22). Covered Causes of Loss means direct "loss" unless the "loss" is excluded or limited in this coverage part. (APP. 36)

The COVID-19 pandemic is thus indistinguishable from other natural disasters. Unless specifically excluded from the Policy, COVID-19 is a disaster that poses an imminent threat of severe damage, injury, or loss of property. As there is no express written exclusion for "disaster,[1]" "virus" or "pandemic" in this Policy, Plaintiff is substantially justified in obtaining coverage under its all-risk Policy.

> **b.  "Physical loss or damage" is not limited to structural loss.**

Cincinnati asks this Court to dismiss Plaintiff's complaint by asking the Court to adopt an unreasonably narrow definition of "direct physical loss," a definition that is inconsistent with both the plain language of the words and jurisprudence on this issue. Cincinnati's position is that it is entitled to deny coverage under the Policy because, in its view, "direct physical loss" must necessarily mean "direct *structural* loss."

First, the plain language of the Policy warrants coverage for the COVID-19 pandemic. As the Policy states:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The suspension must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of

---

[1] "Weather conditions, but this exclusion only applies if weather conditions contribute in any way with a cause or event exclude in **SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions, (1)(a) through (1)(h)** to produce the "loss".  (APP 41).  The COVID-19 Disaster as declared by the Governor of the State of Texas is not expressly excluded in the Policy's Exclusions.

Insurance is shown on the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

(APP. 49, 51, 117).  "Suspension" means (a) the slowdown or cessation of your business activities; and (b) that a part of all of the "premises" is rendered untenantable. (APP. 71).

The Policy does not define "direct" or "physical."  The next question is what the term "loss" means here. The Policy offers an answer: it defines "loss" as "accidental loss or accidental physical damage." [APP. 69, 72[2], 76].  The Policy covers loss *or* damage. That even without a measurable "loss" in value or in function, the Policy expressly contemplates the possibility that there may still be 'damage,' presumably giving it a different meaning than the word 'loss.' Cincinnati has given no reason to believe that inclusion of the phrase "or damage" in the definition of loss was superfluous. In fact, it has offered no explanation for the inclusion of both words, despite, having written the Policy.

Moreover, the Policy does not define "physical." The word should, therefore, be given its ordinary meaning. *Mellin v. Northern Security Ins. Co.*, 115 A.3d 799, 803 (N.H. 2015) ("Because, as Northern notes, the policy does not define the term 'physical loss,' we give the words their ordinary meaning."); *see also Pawtucket Mut. Ins. Co. v. Hartford Ins. Co.*, 787 A.2d 870 (N.H. 2001); *see also Homeowners Choice Prop. & Cas. V. Maspons,*  211 So.3d 1067, 1069 (Fla. 3d DCA 2017)(citation omitted).

The disputed term "physical" refers to things "of or pertaining to matter, or the world as perceived by the senses, material as [opposed] to mental or spiritual." 2 *Shorter Oxford English Dictionary* 2194 (6th ed. 2007). Therefore, under the Policy, "physical" encompasses not only

---

[2] It was clarified that "loss" is now described simply as direct "loss" thereby dropping the unneeded word *physical*. (APP. 72)

tangible changes to the premises, but also intangible changes, such as the presence of a dangerous virus on the premises.

There is a long-running debate in the case law as to what constitutes "physical loss" as distinct from "physical damage," with the insured logically demonstrating that the word "loss" cannot be collapsed into and mean the same thing as "damage." While "damage" indisputable includes tangible or structural physical damage such as inflicted by a tornado, "loss" must mean something different from "damage." Here, COVID-19's actual physical presence or in the vicinity of the premises like the Plaintiff's restaurants prevents the insured from making full use of the premises, especially in cases where the business (as here) has had to close in in part or in full. This kind of loss constitutes physical loss to the property because it cannot be used for the insured's purpose. Thus, courts have long made this distinction between "physical damage" and "physical loss" in contexts analogous to COVID-19. For example, in *Motorist Mut. Ins. Co. v. Hardinger,* 131 Fed. Appx. 823 (3d Cir. 2005)(applying Pennsylvania law), the court found that bacterial contamination of the home's water supply constitutes a "direct physical loss to the property" because, despite the lack of physical damage, it rendered the home to dangerous to inhabit. And in *Cooper v. Travelers Indemnity Co. of Ill,* Case No. 01-2400, 2002 WL 32775680 (N.D. Cal. Nov, 4, 2002), where a tavern was forced to close due to e-coli contamination in its well water, the court held the e-coli constituted "direct physical damage to the property" and ordered the insurer to pay time element/extra expense coverage.

Under a property insurance policy, the "diminution of value of something," including through the failure of something to "perform its function," can constitute a physical loss. *Homeowners Choice Prop.,* 211 So.3d at 1069. The use of the disjunctive "or" in the phrase "direct

physical loss or damage" suggests that either a loss or damage is required and that a loss is distinct from the damage. *Foremost Ins. Co. v. Medders,* 399 So.2d 128, 130 (Fla. 5th DCA 1981).

The terms of the Policy establish that there are two alternative triggers of coverage: one, if there is "loss of" property or two, if there is "damage to" property. *Garcia v. Dep't of Soc. & Health Servs.,* 10 Wn. App. 2d 885, 911, 451 P.3d 1107 (2019)(term "or" is disjunctive and employed to indicate an alternative. The average lay person purchasing the Policy would understand this insuring language to cover the loss of the functionality of the covered property as *physical loss f or damage to* property. This is particularly true under the well settled law that a grant of coverage in an insurance policy must be construed broadly in favor of coverage. Dictionary definitions of "loss" include "destruction," "ruin" or "deprivation."[3]  Even the term "damage" is not limited to the physical alteration of property, but includes any reduction in its "value or usefulness." One court explained the term "damage" as follows:

> One dictionary defines "damage" as "injury or harm that reduces value or usefulness." *Random House Dictionary of the English Language,* 504 (2nd ed. 1987). Another defines it as "injury or harm to a person or thing, resulting in a loss in soundness, value, etc." *Webster's New World Dictionary,* 356 (2nd ed. 1980). A legal dictionary defines "damage" in part as "every loss or diminution" of a person's property. *Black's Law Dictionary* 389 (6th ed. 1990). Clearly, without qualification the term "damage" encompasses more than physical or tangible damage.

*Dundee Mut. Ins. Co. v. Marifjeren,* 587 N.W.2d 191, 194 (N.D. 1998)

As in the case in most property insurance policies, Cincinnati chose not to include the word "structural" and/or "visible" as a modifier to the terms "loss" and "damage." Cincinnati's argument that direct physical loss or damage requires visible alteration of an insured structure has been rejected by several courts. *Azalea Ltd. v. American States Ins. Co.,* 656 So.2d 600 (Fla. 1st DCA 1995).

---

[3] *Loss,* Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited July 3, 2020)

Any ambiguities as to the plain language of the Policy should be construed in favor of the insured. In Texas, insurance policies will be interpreted liberally in favor of the insured and ambiguities strictly against the insurer, especially when dealing with exceptions and words of limitation. *Dow Chem Co. v. Royal Indemn. Co.*, 635 F.2d 379, 386 (5th Cir. 1981); *Ramsay v. Maryland Am. General Ins. Co*., 533 S.W.2d 344, 347 (Tex. 1976). Furthermore, when the language of the insurance policy is susceptible of more than one reasonable construction, courts should apply that construction which favors the insured and permit recovery. *Dow Chem. Co.,* 635 F.2d at 386; *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755 (Tex. 1977); *see, e. g., Snyder Nat'l Bank v. Westchester Fire Ins. Co.*, 425 F.2d 849 (5th Cir. 1970); *Aetna Cas. and Sur. Co. v. Yates*, 344 F.2d 939 (5th Cir. 1965).

Therefore, given that the plain meaning of the word "physical" contemplates intangible changes to the property and any ambiguities to this effect should be construed in favor of the insured, Cincinnati's definition of "direct physical loss" should not be adopted.

Additionally, Defendant Cincinnati's perspective is a clear misinterpretation of the law. In fact, several jurisdictions have adopted the view that "direct physical loss" is not necessarily a structural loss. The following is a list of substances that courts around the country have held caused direct physical loss or damage on property:

- **The smell of cat urine**. *Mellin*, 115 A.3d at 805–06 (holding that the insured did not have to demonstrate tangible physical alteration to prove that the property was uninhabitable, so cat urine that emanated from another condominium unit caused "direct physical loss" to the Plaintiff's condominium).

- **An unpleasant odor described as a "locker room smell."** *Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009).

- **Ammonia in the air.** *Gregory Packaging, Inc. v. Travelers Prop. Cas. Of Am.*, No. 2:12-CV-04418, 2014 WL 6675934, at *8 (D. N.J. Nov. 25, 2014) (holding that ammonia released inside a juice packaging facility constituted "physical loss or damage" because the ammonia physically transformed the air in the facility, therefore making the facility unfit for occupancy until the ammonia dissipated.).

- **Gasoline vapors.** *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (a church building sustained "direct physical loss" when the building was saturated with gasoline vapors, as to make it incapable of being occupied or used.).

- **A blackout causing an electrical grid outage.** *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724, 737 (N.J. Super. Ct. App. Div. 2009) (holding that the grid experienced "physical loss or damage" when a blackout caused the grid to be physically incapable of performing its essential functions, so the property's temporary and non-structural loss of function was deemed "direct physical loss.").

- **Toxic gases.** *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 708 (E.D. Va. 2010), *aff'd* 504 F. App'x 251 (4th Cir. 2013)(noting that the majority of cases nationwide find that physical damage to the property is not necessary where, at least, the property has been rendered unusable by a covered loss).

- **Bacteria.** *Motorists Mut. Ins. Co. v. Hardinger,* 131 Fed. App'x 823, 827–28 (3d Cir. 2005) (a home experienced "direct physical loss" when the water supply became contaminated with a dangerous bacterium.).

- **Unknown substance** *Azalea Ltd. v. American States Ins. Co.,,*  656 So.2d 600 (Fla. 1st DCA 1995) (release of an unknown substance into a sewage treatment plant causing the plant to shut down even though the plant was not visibly altered. The court rejected

the insurer's argument that there was no direct physical loss to the plant because there was no structural damage. The court found that there was a physical loss because the "facility could not operate or exist" subsequent to the dumping of the unknown substance and the substance "actually covered and adhered to the interior of the structure" *Id.* at 602.

Clearly, "direct physical loss or damage" is not limited to structural alterations to the premises; physical loss may include not only changes to the insured premises, but also changes that exist in the absence of structural damage. *Mellin*, 115 A.3d at 805. Courts have consistently held that the presence of a dangerous substance in a property constitutes "physical loss or damage." *See, e.g., Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co*., 720 N.E.2d 622, 625–26 (Ill. Ct. App. 1999), *as modified on denial of reh'g* (Dec. 3, 1999); *see also Sentinel Mgmt. Co. v. New Hampshire Ins. Co.,* 563 N.W.2d 296, 300 (Minn. Ct. App. 1997)("Direct physical loss may also exist in the absence of structural damage to the insured property." (citations omitted). This is so because

> To accept [the insurance company's] interpretation of its policy would be to conclude that a building that has been overturned or has been placed in such a position as to overhang a steep cliff has not been 'damaged' so long as its paint remains intact and its walls adhere to one another. Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. *Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.*

*Hughes v. Potomac Ins. Co.,* 18 Cal. Rptr. 650, 655 (Cal. Dist. Ct. App. 1962)(emphasis added).

Defendant's justification to exclude COVID-19 from coverage, by limiting "direct physical loss" to structural damage, is unwarranted. Surely, if foul smells and gasoline vapors constitute "direct physical loss or damage" as to warrant coverage under a property insurance policy, a

dangerous virus that adheres to surfaces, making property dangerous to the touch, and endangers the health and physical well-being of the insureds' employees and customers, would be as well. Additionally, Cincinnati excluded bacteria from Policy coverage -  bacterium in theory would result and cause a similar loss or damage that Plaintiff has suffered as a result of the COVID-19 virus that was <u>not</u> excluded from Plaintiff's all-risk Policy.  As shown herein, had Cincinnati intended to exclude viruses or held a belief that viruses could not cause *structural damage* then Cincinnati could have availed itself to the industry virus exclusion.

Cincinnati's Motion to Dismiss for Failure to State a Claim should be denied because Plaintiff has plead sufficient facts and established that Plaintiff has suffered a physical loss, which is not limited to the structural damage to the premises.

### c.    A Property's unsuitability for an intended purpose constitutes "physical loss or damage"

"In determining damage covered by insurance, [a] court must consider the nature and intended use of property, and the purpose of the insurance contract." *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts,* Case No. 01-cv-1362, 2002 WL 31495830 at *28 (D. Or. June 18, 2002). A dine-in restaurant's intended purpose include provide a safe environment for its occupants, and the use of enjoyment of that property by its customers without being placed in a dangerous situation. The inability to use the property or a portion of the property for the intended use constitutes a direct physical loss. *Matzner v. Seaco Ins. Co.,*  Case No. 96-0498, 1998 WL 566658 (Mass. Super. Aug. 26, 1998)(holding the loss of use of apartment building, rendered uninhabitable by carbon monoxide, constituted a direct physical loss); *Western Fire Ins. Co. v. First Presbyterian Church,* 437 P.2d 52 (Colo. 1968) (holding the loss of use of charge, rendered uninhabitable by gasoline vapors, constituted a direct physical loss).

COVID-19 is inherently noxious and its presence, presumed presence, or imminently threated presence renders the restaurant unusable or unsafe for its intended purpose. *Lillard-Roberts,* Case 01-cv-1363, 2002 WL 31495830 at * 29 ;  *Cooper & Olive Indus. v. Travelers Indem. Co.,* Case No 01-cv-2400, 2002 WL 32775680 at *5 (N.D. Cal. Nov. 4, 2002)(policyholder could claim business income and losses from contamination of well with E. *coli*  bacteria); *Pillsbury Co. v. Underwriters at Lloyds,* 705 F. Supp. 1396, 1401 (D. Minn. 1989) (creamed corn products suffered physical loss or damage where product was under-processed, causing contamination and its eventual destruction).

Better reasoned decisions find "physical loss or damage" where the loss is temporary, or the reduction in utility is partial. In *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.,* Case No. 2:12-cv-04418, 2014 WL 6675934 (D. N.J. Nov. 25, 2014), the insurance company argued a manufacturing plant that was evacuated following the release of ammonia had not suffered physical loss or damage because the ammonia was remediated over the course of a week. The court rejected this rationale, holding "the property [could] sustain physical loss or damage without experiencing structural alteration," and there was physical loss or damage to the plant for ammonia because "the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." *Id.*  at *16-17. Similarly, "even where *some utility remains*" in a business operation, a physical condition that renders a property unusable for its intended use constitutes physical loss or damage. *Cook v. Allstate Ins. Co.,* Case No. 48D02-0611-PL-01156 *9-10 (Ind. Super. Nov. 30, 2007).

   **d.**   **Both Contamination and Suspected Contamination Cause "Physical loss or damage"**

Suspected contamination of property by the novel COVID-19 is enough to damage insured property. As was recently noted by the Pennsylvania Supreme Court:

> The enforcement of social distancing to suppress transmission of the disease is currently the only mitigation tool . . . COVID-19 does not spread because the virus is 'at' a particular location. Instead it spreads because of person-to-person contact . . . [and] [t]he virus can live on surfaces for up to four days and can remain in the air within confined areas and structures.

*Friends of DeVito v. Wolf,* Case No. 68 MM 2020 at *38-39 (Pa. April 13, 2020). As set forth in Plaintiff's Petition, numerous civil authority orders found that COVID-19 is causing physical damage to properties due its ability to attach to surfaces for prolonged periods of time. *See* Dallas Amended Ordinance (Dkt. 1-6 ¶32). It is statistically certain that COVID-19 was and continues to be present in high-trafficked restaurants such as the insured.  The risk of transmission and property damage is heightened in restaurants, where air is recirculated, space is limited, and tables turnover frequently.  Case law has long supported the proposition that contamination of a property, or the surrounding area, by a disease-causing or noxious agent causes physical loss or damage when it is present in/around the property and/or permeates the interior of the insured property. *See, e.g. Schlamm Stone & Dolan LLP v. Seneca Ins. Co.,* 800 N.Y.S.2d 356 (N.Y. Sup. Ct. 2005) (noxious particles present in the insured property constituted property damage under the terms of the policy); *Azalea,* 656 So. 2d 600 (physical loss and damage were unknown substance adhered to surfaces of insured property); *Am. All Ins. Co. v. Keleket X-Ray Corp.,* 248 F.2d 920, 925 (6th Cir. 1957)(contamination of property with radioactive dust and radon gas were present in property thereby causing physical loss an damage).

Courts have also held there does not have to be actual contamination of property, so long as a physical cause imminently threatens a property's function or habitability. *Port Auth. V. Affiliated FM Ins., Co.,* 311 F.3d 226, 236 (3d Cir. 2002)(physical loss or damage results "if an actual release of asbestos fibers from asbestos-containing materials has resulted in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made

useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility."; *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.,* 787 F.2 349, 352 (8th Cir. 1986) (policyholder could claim business income coverage where risk of collapse necessitated abandonment of grocery store).

### ii.   Cincinnati Insurance Company cannot meet its burden to establish an exclusion.

Because Plaintiff has plausibly established that COVID-19 caused physical loss or damage to the premises covered under the Policy, the burden shifts to Cincinnati to establish the application of an exclusion, which Cincinnati has failed to do. Because no exclusions are applicable in this instance, this Court should deny Cincinnati's Motion to Dismiss.

In this case, the Policy at issue is an "all-risk" type insurance policy, meaning that unless the Policy specifically enumerates an exclusion, the peril is covered. In other words, an "all-risk" policy provides for recovery for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage. *Dow Chem. Co.*, 635 F.2d at 386; *Miles v. Royal Indem. Co.*, 589 S.W.2d 725, 729 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.). "All-risks" policy, meaning it generally covers any "physical loss or damage to Covered Property at the premises," no matter what causes that loss or damage, *unless* the Policy specifically excludes or limits coverage for losses resulting from a specific cause. *SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's London,* 179 S.W.3d 619, 627, n. 3 (Tex. App. – Houston [1st Dist.] 2005, pet. denied)("As a general rule, an all-risks policy creates a special type of coverage in which the insurer undertakes the risk for all losses of a fortuitous nature that, in the absence of the insured's fraud or other intentional misconduct, is not expressly excluded in the agreement."). Since COVID-19 is a covered peril under the Policy, Cincinnati has the burden to establish that a pandemic or virus is specifically excluded. *Morrison Grain Co. v. Utica Mut. Ins.*

*Co.,* 632 F.2d 424, 430 (5th Cir. 1980) ("It would seem to be inconsistent with the broad protective purposes of 'all risks' insurance to impose on the insured, as Insurer would have us do, the burden of proving the precise cause of the loss or damage.").

Cincinnati cannot meet this burden. There are no specific exclusions for a virus or a pandemic, and Cincinnati cannot conjure up one by stretching other exclusions; in Texas, insurance policies will be interpreted liberally in favor of the insured and ambiguities strictly against the insurer, especially when dealing with exceptions and words of limitation. *Dow Chem Co.*, 635 F.2d at 386; *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 347 (Tex. 1976).

Had Cincinnati wished to exclude viruses from coverage, it should have written the Policy that way. Many insurers utilized the standard virus exclusion in their Policies, but Cincinnati chose not to.[4] Cincinnati did exclude bacteria from coverage from the Policy. Indeed, the insurance industry has promulgated forms that recognize the distinction between viruses and bacterium and, when applicable, provide for the exclusion of both. An example promulgated form is set forth in Plaintiffs' Petition.(Dkt. 1-6 ¶44) While the presence of such an exclusion does not necessarily preclude coverage, the failure to include such an exclusion: (1) undermines an insurer's attempt to re-write an existing policy post-loss to deny claims involving viruses; and, (2) confirms that viruses are covered causes of loss that can cause physical loss and damage under an all-risk policy.

When faced with ambiguous terms, a court must "resolve the uncertainty by adopting the construction that most favors the insured." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.,* 811 S.W.2d 552, 555  (citing *Barnett v. Aetna Life Ins. Co.,* 723 SW2d 663, 667 (Tex. 1987).  Under the second rule of construction, a court "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if

---

[4] The Insurance Services Office form CP 01 40 07 06 is "Exclusion of Loss Due to Virus or Bacteria."

the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 423 (5th Cir.2010) (quoting *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co*., 141 S.W.3d 198, 202 (Tex. 2004). Under both rules of construction, then, even if Cincinnati's proposed question was a reasonable interpretation of the Policy, the Court must adopt the interpretation that favors Plaintiff.

Finally, Cincinnati's interpretation—that any loss not structural in nature—fails because it effectively renders Plaintiffs' "all-risk" policy illusory. "All-risk" policies create "a special type of coverage that extends to risks not usually covered under other insurance." *Dow Chem. Co. v. Royal Indem. Co*., 635 F.2d 379, 387 (5th Cir. 1981). If such accidents were not covered, "the 'all risks' peril expressly insured would become perilously close to a policy insuring no risk." *Dow*, 635 F.2d at 387. To sum, because Plaintiff has plead sufficient facts to entitle it to coverage under the Policy and Defendant is incapable of pointing to an exclusion, this Court should deny Cincinnati's Motion

## C.     Plaintiff Has Plead Sufficient Facts to Survive on Its Breach of Good Faith and Fair Dealing Claim

Plaintiff has plead sufficient facts to establish its claim for breach of good faith and fair dealing. The Supreme Court of Texas has held that "the special relationship between an insurer and insured justifies the imposition of a common-law duty on insurers to deal fairly and in good faith with their insured." *USAA Texas Lloyds Company v. Menchaca,* 2017 Tex. LEXIS 361, 60 Tex. Sup. Ct. J. 672, 2017 WL 1311752, at *3 (Tex. 2017) (citing *Arnold v. Nat'l Cty. Mut. Fore Ins. Co.,* 725 S.W.2d 165, 167 (Tex. 1987)) (internal quotations omitted). A cause of action for breach of the duty of good faith and fair dealing is stated when it is alleged that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay. *Arnold, 725 S.W.2d at 167*.

It is well-established that a special relationship between an insured and an insurer imposes upon the insurer a duty to investigate thoroughly and in good faith. *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 568 (Tex. 1990). *Jaramillo v. Liberty Mut. Ins. Co*., No. 4:18-CV-00338-Y, 2019 WL 8223608, at *8 (N.D. Tex. Apr. 29, 2019). An insurer may also be liable for damages for its breach of this duty when it fails to attempt to effectuate a settlement where its liability has become reasonably clear or where it fails to reasonably investigate a claim to determine whether its liability is reasonably clear. *Universe Life Ins. v. Giles*, 950 S.W.2d 48, 50-51, 55, 56 n. 5 (Tex. 1997). A breach may also occur when "the insurer has no reasonable basis for denying or delaying payment of [a] claim, and the [insurer] knew or should have known that fact. *Id.* at 50-51 (citation omitted).

On March 17, 2020, Plaintiff through Swingle, provided a notice of claim under the Policy to Cincinnati's agent for notice of claims. (Dkt 1-6 ¶33). Six (6) days later on March 23, 2020, Cincinnati's agent ostensibly submitted a "reservation of rights" letter to Plaintiff, but which in actuality, was a denial of Plaintiff's claim stating in pertinent part:

> Your notice of claim indicates that your claims involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises.

(Dkt -1-6 ¶34). Clearly, Cincinnati's "reservation of rights" letter denied Plaintiff's claims, without any investigation whatsoever. Cincinnati's position, reiterated in its pleadings, is that the cornonavirus cannot and does not constitute a covered loss or damage under the Policy; despite the absence of virus exclusion to the Policy. After denying that the coronavirus can be a covered loss, Cincinnati subsequently invited Plaintiff to establish that it had the virus at its premises, nonetheless.

Cincinnati is not only obligated to investigate claims under Texas law, but it is obligated to do so within 15 days of notice of a written claim under its Policy. (APP. 110).

By summarily rejecting Plaintiff's claim in the guise of a "reservation of rights" letter, refusing to conduct an investigation into Plaintiff's claim, and then shifting the burden of the investigation to Plaintiff, Cincinnati acted breached its contractual obligation, violated Texas State Law, and breached its duty of good faith. Plaintiff has sufficiently plead breach of good faith and fair dealing, and therefore Cincinnati's Motion to Dismiss must be denied.

D.     **Plaintiff Has Stated a Sufficient Claim for Civil Authority Coverage**

Cincinnati's comparison of the Government's Closure Orders and the COVID-19 global pandemic to that of a "curfew" ordinance is quite the back-handed slap in the face to the public, which only further reflects the callousness of the insurance industry when faced with having to face its affirmative obligations after swindling substantive premiums from its insureds for decades based on empty promises and assurances.

Plaintiff's allegations clearly demonstrate that the Closure Orders detailed in Plaintiff's Amended Petition reflect that the State of Texas and City of Dallas took considerable measures to restrict and prohibit all access into restaurants as well as the area immediately surrounding the insured's premises.  (Dkt.1-6 ¶¶ 20, 22, 24-32).  The Policy's Civil Authority Coverage states:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:  (a) Access to the area immediately surrounding the damaged property is prohibited as a result of the damage; and (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(APP. 50).  Cincinnati alleges that Plaintiff has failed to allege the requisite prohibition of access in order to survive Cincinnati's Motion to Dismiss.  However, as alleged by Plaintiff, Plaintiff was prohibited from operating its business except in accordance to the terms of the City of Dallas and the Governor's proclamations and orders. (Dkt. 1-6 ¶¶ 20, 22, 24-32). Those proclamations prohibited any number of people gathering in any public venue in which people congregate for purposes of food or beverage, and prohibited onsite consumption of food, and prohibited access to Plaintiff's premises – patrons were prohibited from accessing the dining or beverage service areas in the restaurant, and from entering the premises and accessing in-servicing sit-down dining. Plaintiff sufficiently pleads the requisite prohibition. The live Petition also alleges facts that the proclamations prohibiting access were due to direct physical loss of or damage to property other than at Plaintiff's premises: it alleges that COVID-19 has been deemed a pandemic, and that Governor Abbot declared a State of Emergency in Texas as a result. Further, Judge Clay Jenkins has recognized and declared the existence of physical property damage resulting from the pandemic. (Dkt. 1-6 at ¶¶ 20, 22, 24-32).  Thus, the causal link between actual damage to nearby premises and the prohibition of access is properly plead in Plaintiffs' Amended Petition.

Here, Plaintiff has plead sufficient facts to establish that Plaintiff's property was prevented by Order of civil authority issued by a direct result of damage and loss to other premises in the proximity' of the insured's premises. Cincinnati's blanket assertion that Plaintiff, its employees and patrons were not precluded from its premises or the accompanying premises is disingenuous as the Closure Orders limited gatherings of all persons in groups of more than five, and effectively prohibited patrons and certain employees from access into the premises. Cincinnati's position that because there is no structural damage to the premises or accompanying premises is again misconceived based on the jurisprudence and language used by Cincinnati. Judge Jenkins declared

that the virus physically caused property damage. (Dkt.1-6 ¶ 32). Plaintiff incorporates its arguments set forth above. Plaintiff has satisfied its burden for purposes of Rule 12(b)(6), and it would be improper to dismiss Plaintiff's claim for Civil Authority Coverage.

**E.    Vandelay's Texas Insurance Claims Survive Cincinnati's Motion To Dismiss**

Plaintiff has plead sufficient facts to under the Texas Insurance Code to survive Cincinnati's Motion to Dismiss.  As plead by Plaintiff, Cincinnati was required under the Texas Insurance Code to conduct an investigation of Plaintiff's claims, and Cincinnati wholly failed to undertake this duty to investigate, and instead, attempted to shift the burden to investigate on the Plaintiff when thirty-five (35) days after its reservation of rights letter Cincinnati served another letter on the Plaintiff putting the onus on the Plaintiff to investigate its own claims on behalf of Cincinnati. (Dkt 1-6 ¶47); (APP 110).

At no time after the receipt of the Plaintiff's claim did Cincinnati request a signed, sworn proof of loss which the Policy required Cincinnati to do. (APP. 110). This request is particularly important because according to the Policy Cincinnati had fifteen (15) days after receiving the sworn proof to notify the Plaintiff whether:1) the claim or part of the claim will be paid; 2) The claim or part of the claim has been denied, and inform them of the reasons for denial; (3) More information is necessary; or, (4) they need additional time to reach a decision. (APP 110).

To date, Plaintiff has yet to receive: 1) a request for a sworn proof of loss; 2) a notification or letter from Cincinnati detailing its conclusion or decision of Plaintiff's claim regarding the full extent of the claimed damages; or, 3) a request for additional time to reach a decision. Yet, despite failing to comply with its own Policy and never providing Plaintiff with a decision regarding the full extent of the claimed damages Cincinnati alleges in its Motion to Dismiss that Plaintiff's claims are not covered under the plain terms of the Policy. Cincinnati's refusal to render a decision

on coverage as it was required to do is an admission that the Plaintiff has coverage under the Policy. Moreover, Texas Insurance Code Subsection 542.056(c) states that "[i]f the insurer rejects the claim, the notice required by Subsection (a) or (b) must state the reasons for the rejection." TEX. INS. CODE ANN. § 542.056(c). The first and only indication that Cincinnati's position was that the Plaintiff's claim was denied and/or not covered under the Policy was in its Motion to Dismiss filed in this case. On the other hand, if it is Cincinnati's position that its March 23, 2020, reservation of rights letter was also a denial of coverage the denial was made in bad faith and without any investigation into the facts and/or circumstances surrounding the claim. Thus, Plaintiffs have plead sufficient facts to overcome Cincinnati's Motion to Dismiss.

**F.    Vandelay Properly Pleads Prompt Payment Act**

Plaintiff has sufficient stated a claim under the Prompt Payment Act. Under this subsection, Plaintiff must show(1) the plaintiff had a claim under an insurance policy; (2) the plaintiff gave proper notice of its claim to the insurer; (3) the insurer is liable for the claim; and (4) the insurer violated Chapter 542 by not timely (a) acknowledging receipt of the claim, commencing any investigation of the claim, and requesting from the claimant all items, statements, and forms that the insurer reasonably believes, at the time, will be required from the claimant; (b) accepting, rejecting, or extending the deadline for deciding the claim; and (c) paying the claim. Tex. Ins. Code  §§ 542.051, 542.055, 542.056, 542.058, 542.060. Plaintiffs plead all the requisite elements, and thus Cincinnati's Motion to Dismiss must be denied.

## CONCLUSION

The Cincinnati Insurance Company has failed to satisfy its high burden in establishing that Plaintiff has failed to state a claim upon which relief may be granted. Plaintiff properly alleges claims against Cincinnati, and therefore Cincinnati's motion should be denied.  Alternatively, if

the Court believes the Motion should be granted in whole or in part, Plaintiff requests leave to amend its Complaint.

Respectfully submitted,
**FRIEDMAN & FEIGER, L.L.P.**

/s/ *Shauna A. Izadi*
_____
**SHAUNA A. IZADI**
State Bar No. 24041170
Email: sizadi@fflawoffice.com
**JASON H. FRIEDMAN**
State Bar No. 24059784
Email: jason@fflawoffice.com
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

<u>**CERTIFICATE OF SERVICE**</u>          **ATTORNEYS FOR PLAINTIFF**

I hereby certify that on July 3, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties who have appeared and registered with CM/ECF.

/s/ *Shauna A. Izadi*
Shauna A. Izadi