**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| VANDELAY HOSPITALITY GROUP LLC D/B/A HUDSON HOUSE., | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:20-CV-01348-D |
| THE CINCINNATI INSURANCE COMPANY, | § § § § § | |
| Defendant. | § § | |

---

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

---

TO THE HONORABLE JUDGE OF SAID COURT:

**TO THE HONORABLE JUDGE OF SAID COURT:**

     **COMES NOW,** Plaintiff Vandelay Hospitality Group LLC  d/b/a Hudson House, and files this Second Amended Complaint, complaining of and against The Cincinnati Insurance Company ("Cincinnati") over Cincinnati's anticipated refusal to provide insurance coverage, and would respectively show this Court the following:

<strong>I.     PARTIES</strong>

     1.     **Plaintiff Vandelay Hospitality Group LLC d/b/a Hudson House** ("Vandelay and/or "Plaintiff") is a Texas Limited Liability Company doing business in Dallas, Texas.

     2.     **Defendant The Cincinnati Insurance Company** ("Cincinnati" and/or "Defendant") is in the business of insurance in the State of Texas with a certificate of authority to engage in the business of insurance in the State of Texas.  Defendant is incorporated in the State of Ohio, and maintains its principal place of business in Ohio.

## II.    JURISDICTION & VENUE

3.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Plaintiff and Defendant are citizens of different states. [1]

4.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Cincinnati has marketed, advertised, sold and maintained insurance policies and otherwise conducted extensive business, within this District.  Venue is proper in Dallas County, Texas because, among other reasons, all or a substantial portion, of the events involved in this lawsuit occurred in Dallas County, Texas.

5.    This Court has jurisdiction to grant declaratory relief under 28 USC § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the loss of business arising from the civil authority events detailed below. [2]

6.    This Court has personal jurisdiction over Cincinnati because Cincinnati has submitted to jurisdiction in this state by transacting business in Texas, contracting to insure a person, property or risk located in Texas at the time of contracting and making a contract substantially connected with Texas. Cincinnati's business includes but is not limited to: (a) making and issuing insurance contracts with the Plaintiff and Texas residents similar to the Plaintiff; (b)

---

[1] Plaintiff maintains that the Court is without jurisdiction based upon the lack of diversity and Defendant's defective removal of this action from the state court.  Based upon the Court's rulings, however, the sole basis for jurisdiction if any, in this Court is under 28 U.S.C. § 1332(a)(1).

[2] Prior to removal, Plaintiff originally asserted claims under the Texas Declaratory Judgment Act.  Because of Defendant's removal, the Texas Declaratory Judgment Act is no longer viable in this Federal Court proceeding. Plaintiff reserves the right to seek relief under the Texas Declaratory Judgment Act in the event this Court is ultimately determined to be without jurisdiction and/or this matter is remanded to the State Court.

taking or receiving applications for insurance from Texas residents including the Plaintiff's application; (c) receiving or collecting premiums, commissions, membership fees, assessments, dues or other consideration for any insurance or any part thereof, including any such consideration or payments from the Plaintiff; and, (d) the issuance or delivery of contracts of insurance to residents of the State of Texas or person authorized to do business in the State of Texas, including the Plaintiff. In addition, Defendant Cincinnati exercises substantial, systematic, and continuous contacts with Texas by doing business in Texas, serving insureds in Texas, and seeking additional business in Texas.

### III.       INTRODUCTION

7.       Plaintiff is the owner and operator of several restaurants in Dallas who have been forced to cease its full-service operations as a result of physical damage and physical loss to Plaintiff's business property, including but not limited to its equipment and fixtures; as confirmed by recent orders issued by the City of Dallas and the State of Texas, to cease its full-service operations – through no fault of its own – as part of the City and State's effort to slow the spread of the COVID-19 global pandemic.

8.       The limitations caused by the physical damage and loss, and as mandated by these orders, presented an existential threat to Plaintiff and to other small, local businesses that employ hundreds of Dallas residents. To protect its restaurants from situations like these, which threaten its livelihoods based on factors wholly outside of its control, Plaintiff purchased, through Cincinnati's registered broker Swingle Collins Company, LLC ("Swingle"), a commercial property insurance policy, that includes business interruption insurance, insuring Vandelay for losses and damages resulting from occurrences, including the necessary suspension of business

operations at any insured location caused by a government order, during the relevant time period (hereinafter the "Policy").

9.      The Policy Vandelay acquired is known as an "all risk" or "exclusionary" policy. Businesses obtain these type of policies due, among other reasons, to the fact that insurance policies can be, and are often designed to be, so "dense," complicated, and confusing, that an insured's ability to understand what *is actually covered* is difficult, at best.  All-risk policies dispense with much of the problems by insuring against all risks within a covered loss, unless the risk is specifically excluded in the policy or an endorsement to the policy.  Vandelay paid for and obtained an exclusionary policy for these very reasons.

10.      While the Policy was in effect, Plaintiff was forced to suspend or reduce business at its covered premises due to the loss and damage caused by the virus, COVID-19 and the ensuing orders issued by civil authorities in Dallas County and the State of Texas, mandating the suspension of business for on-site services, as well as in order to take necessary steps to prevent further loss and damage and minimize the suspension of business and continue operations.

11.      Importantly**,** the insurance industry has promulgated, and in fact sell, commercial insurance policies that include business interruption insurance, that specifically excludes coverage of losses relating to viruses.  Although the Policy in the instant case contains an endorsement specifically excluding bacteria from the Policy's coverage, the Virus Exclusion Endorsement is not part of the Policy and no other term, provision or endorsement excludes viruses from the Policy coverage.

12.      In blatant breach of its insurance obligations that it voluntary undertook in exchange for Plaintiff's premium payments, Cincinnati has effectively indicated that Plaintiff's claims for loss and damage arising from the COVID-19 virus and the City and State-ordered

interruption of its restaurants was denied without any good faith investigation.  As a result, Plaintiff now brings this action to ensure Plaintiff's receipt of the benefits of the all-risk commercial business owner's insurance Policy issued to Plaintiff, which provides for coverage for losses incurred due to a "necessary suspension" of its operations, including when its businesses are forced to close due to a government order.

## IV.   FACTUAL ALLEGATIONS

13.      In exchange for substantial premiums, Cincinnati sold a commercial property insurance policy promising to indemnify Vandelay for losses and damages resulting from occurrences, including the necessary suspension of business operation at any insured location caused by a government order, during the relevant time period (hereinafter the "Policy"). Vandelay purchased the Cincinnati's commercial Policy through Cincinnati's registered insurance broker, Swingle.

14.      The Policy is an "all risk" policy that provides broad coverage for losses and damages caused by any cause unless expressly excluded in writing.

15.      The Policy insures three (3) of Vandelay' s restaurants, two (2) Hudson House locations and Drake's Hollywood (sometimes collectively referred to as "Insured Restaurants" and/or "Restaurants").

16.      The Insured Restaurants are covered under Cincinnati Policy ECP0495629, which was effective from July 6, 2019 through July 6, 2020. The Policy had been continuously in full force and effect since inception.

17.      To protects its Restaurants in the event it suddenly suspends operations for reasons outside its control, or in order to prevent further property damage, Vandelay obtained business interruption insurance from Cincinnati.

18.     Cincinnati's Policy coverage forms provide "Business Income" coverage, which promises to pay for actual loss due to the necessary suspension of operations caused by, among other things, accidental physical loss or accidental damage to the covered property.

19.     Cincinnati's Policy coverage forms also provide "Extra Expense" coverage, which promises to pay the necessary expenses incurred to avoid or minimize the suspension of business and to continue operations.

20.     Cincinnati's Policy coverage forms also provide "Dependent Property" coverage, which promises to pay for actual loss due to the necessary suspension of operations caused by direct loss to dependent property.

21.     Cincinnati's Policy coverage forms also provide for "Civil Authority" coverage, which promises to pay for loss caused by action of civil authority that prohibits, among other things, access to the premises.

22.     Cincinnati's Policy coverage forms also provide for "Extended Business Income" coverage, which promises to pay for actual loss due to the necessary suspension of operations caused by accidental physical loss or accidental physical damage to the covered property.

23.     Cincinnati's Policy coverage forms also provide "Ingress and Egress" coverage, which promises to pay for actual loss due to the necessary suspension of operations caused by the prevention of existing ingress or egress at the premises.

24.     Cincinnati's Policy coverage forms also provide "Sue and Labor" coverage, which requires the insured "[t]ake all reasonable steps to protect the Covered Property from further damage and keep record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim" in the event of a loss of damage. Plaintiff has taken such steps, for example, complying with the Stay at Home and Closure Orders.

25.      Unlike some policies that provide Business Income (also referred to as "business interruption") coverage, Cincinnati's Policy coverage forms do not include, and are not subject to, any exclusion for losses caused by viruses or communicable diseases.

26.      Upon information and belief, Cincinnati has, on a widescale and uniform basis, refused to pay its insureds under its Business Income, Extra Expense, Dependent Property, Civil Authority, Extended Business Income, Ingress and Egress coverages for losses suffered due to COVID-19, any executive orders by civil authorities that required the necessary suspension of business, and any efforts to prevent further property damage or to minimize the suspension of business and continue operations.

**Coronavirus (COVID-19) and Dallas' & Texas' Response**

27.      For years, if not decades, the Center for Disease Control and the World Health Organization ("WHO") have been warning about the possibility of an airborne virus that could cause a worldwide pandemic. Coronavirus (COVID-19) (hereinafter "COVID-19") is a highly contagious airborne virus that has rapidly spread and continues to spread across the United States. On January 30, 2020, the Director of WHO declared the 2019 Coronavirus "outbreak a Public Health Emergency of International Concern."

28.      On March 11, 2020, the WHO declared the CONVID-19 virus outbreak a pandemic (a widespread epidemic).

29.      The following day, on March 12, 2020, a Declaration of State of Disaster was issued by Texas Governor Abbot to take additional steps to prepare for, respond to, and mitigate the spread of SARS-CoV-2.

30.      That same day on March 12, 2020, the Mayor of Dallas "declared a local state of disaster" for the City of Dallas resulting "from the COVID-19 Pandemic" and issued an Order prohibiting public gatherings of more than 500 people.

31.      On March 12, 2020, Dallas County Judge Clay Jenkins, under the authority of Texas Government Code section 108, issued a DECLARATION OF LOCAL DISASTER FOR PUBLIC HEALTH EMERGENCY. The Declaration stated that "a local state of disaster for public health emergency is hereby declared for Dallas County, Texas, pursuant to Section 418.108(a) of the Texas Government Code.

32.      Judge Jenkins also issued an order on March 12, 2020 stating:

The virus that causes 2019 Coronavirus Disease (COVID-19) is easily transmitted through person to person contact, especially in group settings, and it is essential that the spread of the virus be slowed to protect the ability of public and private health care providers to handle the influx of new patients and safeguard public health and safety.

33.      On March 16, 2020, President Trump acknowledged the gravity of the COVID-19 pandemic and introduced new guidelines to limit people's interactions, including that all Americans should avoid groups of more than 10 people.

34.      On March 16, 2020, Dallas County issued an Amended Order that barred public, private or community gatherings of more than fifty (50) persons. It also provided that: "Restaurants with or without drive-in or drive-through services and microbreweries, micro-distilleries, or wineries may only provide take out, delivery, or drive-through services as allowed by law."

35.      The City of Dallas also issued an Amended Order on March 16, 2020 prohibiting access and use of any premises operated as dine-in restaurants, but allowing operation only as regulated take-out services. The Amended Dallas City Order further provided that "[t]he owner, manager, or operator of any facility that is likely to be impaired by these regulations shall post a

copy of these regulations onsite and visible to users of the facility and provide a copy to any user of the facility asking for a copy." Dallas County issued another Amended Order, which prohibited "[p]ublic or private Recreational Gatherings and Community Gatherings." It further ordered that "[b]ars, lounges, taverns, private clubs, arcades, and gyms shall close."

36.     Effective on March 17, 2020, and in accordance with public health recommendations and directives coming from federal, state and county officials, Plaintiff announced it would be closing all Restaurant locations until the appropriate authorities determined the danger from the COVID-19 pandemic has passed and it is safe to reopen.

37.     Any debate over whether or not Plaintiff was required to temporarily close all of its Texas Restaurant locations was quashed when, on March 19, 2020, Texas Governor Abbott issued a Public Health Disaster Declaration and Executive Order that, among other things, prohibited Texans from gathering in groups of ten or more people, which constructively closed all of Plaintiff's Restaurants.

38.     That same day, the Texas Commissioner of the Department of the State Health Services issued a proclamation, pursuant to Texas Health and Safety Code § 81.002, which (1) declared a public health disaster for the entire State of Texas; and then (2) ordered that everyone in Texas "shall act responsibly to prevent and control communicable disease."

39.     The Order then listed several standards of responsible action to "reduce and delay the spread of COVID-19," including:

- "Limit as much as possible close contact with other people. Stay six feet away."

- "Do not gather in social groups of more than ten (10) individuals."

- "Limit trips into the public to essential outings. Traveling to work, the grocery store, the pharmacy or to seek medical care would be considered essential trips."

- "Restaurants should not allow dine-in options, either inside or outside."

40.        Dallas County issued another Amended Order requiring those living in Dallas County to shelter at their residence, effective at 12 a.m. March 24, 2020. It allowed only essential businesses to continue to operate.

41.        Dallas County issued a subsequent Amended Order continuing the extraordinary rules and regulations previously adopted, and amended the previous Order stating:

> WHEREAS, this Emergency Order is necessary because of the propensity of the virus to spread to person to person and also because *the virus is physically causing property damage* due to its proclivity to attach surfaces for prolonged periods of time;
>
> WHEREAS, this Emergency Order is necessary to protect the lives, health, welfare, and safety of the County's residents from the devastating impacts of this pandemic. . . . .

42.        The Amended Dallas County Order further provides as to Restaurants:

> Restaurants. Restaurants with or without drive-in or drive-through services and microbreweries, micro-distilleries, or wineries may only provide take out, delivery or drive-through services as allowed by law. *In-person service is prohibited.* Customers may order and pay inside, but are prohibited from waiting inside the restaurant for their food. All food must be brought outside to customers. To allow for increased access to restaurants, this Order hereby suspends all laws and regulations prohibiting people from walking in a drive-through.

**Plaintiff's All-Risk Insurance Policy**

43.        At all relevant times hereto, Plaintiff was an insured under the Policy. At all times mentioned herein, the Policy covered the Restaurants/Premises identified above. Plaintiff intended to purchase, and did in fact purchase, an exclusionary policy, intending to cover, among other things, all business interruptions caused by any event other than those specifically excluded in the Policy in writing.

44.     Plaintiff has performed all of its obligations under the Policy, including but not limited to the payment of premiums and timely reporting of claims. Therefore, the Policy has been in effect since July 6, 2019 without interruption.

45.     The Policy pays for direct physical loss to the covered Restaurants as well as business income and extra expenses incurred due to the necessary suspension of operations. The Policy also pays for losses incurred as a result of business interruption caused by an order from a civil authority.

46.     Under the heading "Covered Causes of Loss," Cincinnati agrees to pay for "direct 'loss' unless the 'loss' is excluded or limited in the Policy.

47.     Cincinnati did not exclude or limit coverage for losses from viruses in Plaintiff's Policy. The Policy also did not exclude pandemic coverage, communicable disease coverage or anything similar.

48.     Cincinnati's conclusory position that the COVID-19 does not constitute direct physical damage, and thus no coverage exists, is not supported by the Policy, or the facts.

49.     Direct physical loss can exist without actual structural damage to property. In analogous circumstances to the COVID-19 agent, the presence of harmful substances at or on a property can constitute property damage or direct physical loss that triggers first party property damage. For instance, ammonia accidentally released into a facility, renders the building unsafe until it can be removed: covered property damage has occurred. If the presence of harmful substances renders the property uninhabitable or unstable, the coverage requirement of direct physical loss as a necessary condition has been met. It has consistently been held that the presence of a dangerous substance in a property constitutes "physical loss or damage."

50.     Losses due to COVID-19 are a Covered Cause of Loss under Cincinnati's Policy.

51.     In the Building and Personal Property Coverage Form and Business Income (and Extra Expense) Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration" caused by direct "loss" to property at the covered premises.

52.     "Loss" is defined to mean accidental physical loss or accidental physical damage.

53.     "Suspension" is defined to mean the slowdown or cessation of business activities and that part or all of the covered premises is rendered untenable.

54.     "Period of restoration" is defined to mean the period of time that begins at the time of direct loss.

55.     "Business Income" is defined to mean net income (net profit or loss before income taxes) that would have been earned or incurred and continuing normal operating expenses sustained including payroll.

56.     The presence of virus or disease can constitute physical loss of or damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm – Insurance Services, Inc., or "ISO" – circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

57.     The ISO also created a new "amendatory endorsement" to exclude loss due to virus or bacteria from coverage afforded by certain insurance policies. The ISO amendatory endorsement states that there is "no coverage for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease" (the "Virus Exclusion").

58.     The insurance industry has promulgated forms that recognize the distinction between viruses and bacterium and, when applicable, provide for the exclusion of both. One such promulgated form provides:

COMMERCIAL PROPERTY
CP 01 40 07 06

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

1. Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

2. Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

59.     Unlike many commercial property policies available in the market, the subject Policy sold by Cincinnati does not include an exclusion for loss caused by a virus. The Policy has rules and conditions regarding bacteria, but it is undisputed that a virus is not a bacterium.

**COVID-19 and the Covered Cause of Loss**

60.      COVID-19 is a highly contagious virus that has rapidly spread and continues to spread across the United States. It is a physical substance, human pathogen and can be present outside the human body in viral fluid particles. According to the CDC, everyone is at risk of getting COVID-19.

61.      COVID-19 is spread by a number of methods, including "community spread," meaning that some people have been infected and it is not known how or where they became exposed. Public health authorities, including the CDC, have reported significant ongoing community spread of the virus throughout the United States.

62.      The CDC has reported that a person can become infected with COVID-19 by touching a surface or object such as a table, floor, wall, furniture, desk, countertop, touch screen or chair that has the virus on it, and then touching their own mouth, nose or eyes.  COVID-19 can also be transmitted through the air ducts, such as those in air conditioner units and heaters. COVID-19 can and does live on and/or remains capable of being transmitted and active on inert physical surfaces.

63.       COVID-19 infections are spread through droplets of different sizes, which can be deposited on surfaces or objects. A human sneeze can expel droplets of mucus and saliva that travel at nearly a hundred miles an hour and can spread up to 27 feet.[3]

---

[3] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/ coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited April 20, 2020).

64.     According to a report in the New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can produce as many viral droplets as one infectious cough."[4] The more people in a conversation, the more droplets are dispersed.

65.     Although these droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

66.     These droplets can spread COVID-19 when they reach humans directly, or when they land on habitable surfaces where they can survive until that surface is touched by a potential host.[5]

67.     Droplets containing COVID-19 infect a variety of surfaces and objects for a period of hours, days or weeks, if not longer. After inspecting a cruise ship inhabited by passengers carrying COVID-19, the CDC reported that COVID-19 was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[6]

68.     Moreover, the New England Journal of Medicine reported finding that experimentally-produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction infectivity during a 3-hour period of observations. An April 2020 study published in the journal Emerging Infectious Diseases found a wide distribution of COVID-19 on surfaces and in the air about 13 feet from patients in two hospital wards. This means

---

[4] *See* Yuliya Pashina-Kottas, et al., "This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited April 21, 2020).

[5] *See, e.g.*, CDC website, "How COVID-19 Spreads," 2020, *available at* https://www.cdc.gov /coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 21 2020).

[6] *See* Leah E. Moriary, et al., "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (March 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited April 21, 2020).

that there has been a positive finding of COVID-19 in the air. In another study, published in the midRxiv depository, has found that the virus could remain in the air 3 hours post aerosolization.

69.      COVID-19 has been transmitted by way of human contact with surfaces and items of physical property located in Dallas County, Texas.  COVID-19 has been transmitted by way of human contact with airborne COVID-19 particles emitted into the air at premises in Dallas County, Texas.

70.      The presence of any COVID-19 particles renders items of physical property unsafe and the premises unsafe.

71.      The presence of any COVID-19 particles on physical property impairs its value, usefulness and/or normal function.

72.      The presence of any COVID-19 particles causes direct physical harm, direct physical damage and direct physical loss to property.

73.      The presence of people infected with or carrying COVID-19 particles renders physical property in their vicinity unsafe and unusable, resulting in direct physical loss to that property.

74.      The presence of people infected with or carrying COVID-19 particles at premises renders the premises, including property located at that premises unsafe, resulting in direct physical loss to the premises and property.

75.      Plaintiff's premises have likely been infected with COVID-19 and they have suffered direct physical loss to the property.  The incubation period for COVID-19 is at least 14 days if not longer.  Current evidence shows that the first death from COVID-19 occurred as early as February 6, 2020 – weeks earlier than previously reported, suggesting that the virus has been circulated in the United States far longer than previously assumed.

76.     It is likely that Plaintiff's customers, employees and other visitors to the insured properties over the last several months were infected with COVID-19 and thereby infected the insured properties with COVID-19.  Upon information and belief, at least a handful of Plaintiff's employees and customers have been infected with COVID-19.

77.     To reduce the spread of the disease, the CDC has recommended that businesses clean and disinfect all surfaces, prioritizing the most frequently touched surfaces, which Plaintiff has done to the premises.

78.     The Policy requires Plaintiff "[t]o take all reasonable steps to protect the Covered Property from further damage" when a loss occurs, which in this instance required Plaintiff to suspend operations to reduce the spread of COVID-19 and to prevent further losses occasioned by its spread on Plaintiff's premises.  Plaintiff has taken such steps, including complying with all government Orders relating to COVID-19, which included suspension of business, disinfection of premises, and social distancing/limiting the number of patrons on premises.

79.     At the very least, Plaintiff suffered a physical loss of the covered property as a result of the COVID-19 coronavirus and the mandated orders and actions taken to limit the impact of the pandemic.  To date, Dallas County has had more than 105,000 positive cases of COIV-19 including 1,269 deaths. As a result of COVID-19, and the emergency orders, Plaintiff not only suffered a loss, but it also caused physical property damages to the Plaintiff's insured locations.

80.     As a result of the government Orders and the COVID-19 virus, Plaintiff suffered losses covered by the Policy, including, but not limited to the COVID-19 virus attaching to the surfaces of the insured's locations for prolonged periods of time, physical contamination of the entire insured premises, the COVID-19 virus infecting Plaintiff's employees as well as Plaintiff's customers, which all constitute a physical loss.

81.     Loss of use of property that has not been physically altered constitutes "physical loss or damage" for purposes of first-party property insurance. Plaintiff lost its use of the premises as a result of the Orders and as a result of the premises likely being contaminated by the COVID-19 virus.

82.     As the drafter of the Policy, if Cincinnati had wished to exclude from coverage as "physical loss or damage" loss of use of property that has not been physically altered or deformed, it could have caused explicit language stating such a definition, but it did not do so.

83.     The presence of COVID-19 caused direct physical loss of or damage to the covered property or "premises" under the Policy, by denying use of and damaging the covered property and by causing a necessary suspension of operations during a period of restoration.

84.     The Closure Orders prohibited access to and use of Plaintiff's covered property, and the area immediately surrounding damaged property, in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that covered the damage.

85.     The presence of COVID-19 and the Closure Orders caused a direct loss to Plaintiff's dependent property, which resulted in a loss of Business Income sustained.

86.     The presence of COVID-19 and the Closure Orders caused a direct loss to locations contiguous to Plaintiff's premises, which prevented existing ingress and/or egress at Plaintiff's premises and caused a loss of Business Income sustained and necessary Extra Expense incurred.

87.     And here, Plaintiff's Restaurant interruption and closure is indisputably a "physical loss" event. Patrons were prohibited to venture inside the restaurant because it was physically dangerous, which is why the relevant Civil Orders were issued, effectively shutting down Plaintiff's restaurants during the relevant time period.

88.        COVID-19 and its pernicious spread created inherently dangerous conditions where the Restaurants and property within them were at immediate and imminent risk of exposure to COVID-19. This caused them to suspend operations and lose access to the Restaurants, which rendered them untenantable.

89.        Under the Civil Orders, the Restaurants were required to close their dining rooms to the public, thereby prohibiting access to, use of, and operations at the Restaurants and rendering them untenantable.

90.        Under the Civil Orders, the Restaurants were required to suspend dine in food offerings at the Restaurant and service of dine in food to customers, thereby prohibiting access to, use of, and operations at the Restaurants and rendering them untenantable.

91.         Under the Civil Orders, customers were prohibited from accessing and using the Restaurants' dining rooms, thereby prohibiting access to, use of, and operations at the Restaurants and rendering them untenantable.

92.        Under the Civil Orders, customers were prohibited by social distancing guidelines from accessing and utilizing the Restaurants' dining rooms, thereby prohibiting access to, use of, and operations at the Restaurants and rendering them untenantable.

93.        Under the Civil Orders, the Restaurants' employees were prohibited from traveling to or accessing the Restaurants for purposes of preparing and serving dine in food, thereby prohibiting access to, use of, and operations at the Restaurants and rendering them untenantable.

94.        Under the Civil Orders, the Restaurants' employees were prohibited from traveling to or accessing portions of the Restaurants (and property therein) utilized exclusively for preparing and serving dine in food, thereby prohibiting access to, use of, and operations at the Restaurants and rendering them untenantable.

95.     Under the Orders, the Restaurants' employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations at the Restaurants' and rendering them untenantable. This includes, but is not limited to, social distancing requirements and other safety requirements that are not compatible with professional use of a kitchen.

96.     Under the Orders, the Restaurants lost access to portions of the Restaurants (and property therein), lost use of the Restaurants (and property therein), lost necessary use of necessary facilities at the Restaurants (and property therein), and suspended operations at the Restaurants which became untenantable.

97.     Because, *inter alia*, the spread of Coronavirus rendered the Restaurants' facilities no longer usable for their intended purpose(s), and in many cases impossible to operate safely, it directly caused them to suffer physical damage and loss.

98.     As a result of the spread of Covid-19, and related government orders, customers and dependent properties were unable to and/or prohibited from holding events from which the Restaurants were contacted to generate and usually generated income.

99.     As a result, the Restaurants suffered and continue to suffer substantial lost business income and other financial losses. These extraordinary losses of business income (and concern for their employees' welfare) are precisely why the Restaurants took out insurance policies with Defendant that included business interruption coverage, which were meant to cover these losses.

100.    The State of Texas the City of Dallas have issued and continue to issue authoritative orders governing Dallasites and their businesses, including Plaintiff's Restaurants, in response to COVID-19 pandemic, the effect of which have required and continue to require Plaintiff to

significantly reduce operations and have limited and continue to limit access, to the covered premises.

101.       Not only has Dallas authorities acknowledged COVID-19 as causing direct physical loss and damage to property, but state and local governmental authorities and public health officials around the United States have acknowledged the same. For example: (a) the State of Colorado issued a Public Health Order indicating that "COVID-19…physically contributes to property loss, contamination and damage…" (b) the City of New York issued an Emergency Executive Order in response to COVID-19 and the Pandemic, in part "because the virus physically is causing property loss and damage" (c) Broward County, Florida issued an Emergency Order acknowledging that COVID-19 "is physically causing property damage" (d) the State of Washington issued a stay at home Proclamation stating the "COVID-19 pandemic and its progression…remains a public disaster affecting life, health [and] property." (e) The State of Indiana issued an Executive Order recognizing that COVID-19 has the "propensity to physically impact surfaces and personal property" (f) the City of New Orleans issued an order stating "there is reason to believe that COVID-19 may spread amongst the population by various means of exposure, including the propensity to attach to surfaces for a prolonged period of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances" (g) the State of New Mexico issued a Public Health Order acknowledging the "threat" COVID-19 "poses" to "property" (h) North Carolina issued a statewide Executive Order in response the Pandemic not only "to assure adequate protection for lives" but also to "assure adequate protection of …property" (i) the City of Los Angeles issued an Order in response to COVID-19 "because among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged

periods of time; and (j) the City of Kansas, Missouri issued a Proclamation in response to COVID-19 "to protect life and property."

102.     The Orders were issued due to direct physical loss of and/or direct physical damage to properties. There are numerous individuals who have tested positive for COVID-19, and those numbers continue to grow. COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties near the Restaurants; and because COVID-19 was and is being transmitted in or between properties throughout the areas near the Restaurants, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces. The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of premises, as well as direct physical damage to premises, and this direct physical loss and/or direct physical damage prompted the issuance of the Orders.

103.     Had Cincinnati wanted to exclude pandemic-related losses under the Policy, it easily could have attempted to do so on the front-end with an express exclusion. Instead, Cincinnati collected substantial premiums, and after a pandemic and the resulting closure orders caused catastrophic business losses to Plaintiff to try to limit its exposure on the backend through its erroneous assertion that the presence of the COVID-19 is not a physical loss and thus is not a covered cause of loss under the Policy.

**Cincinnati Anticipatorily Repudiates Plaintiff's Insurance Coverage**

104.     On March 17, 2020, Plaintiff through Swingle, provided a timely notice of claim under the Policy to Cincinnati's agent for notice of claims.

105.     On March 23, 2020, Cincinnati's agent submitted a reservation of rights letter to Plaintiff, which clearly indicated Cincinnati's position of no coverage.  For example, Cincinnati states:

> At the threshold, there must be direct physical loss or damage to Covered Property caused by a covered cause of loss in order for the claim to be covered. Covered Property generally entails your premises and business personal property. Direct physical loss or damage generally means a physical effect on Covered Property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect. Your notice of claim indicates that your claims involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises.

106.     Although Plaintiff has yet to receive a formal denial of coverage, the above statement from Cincinnati's agent is clear: Cincinnati has no intention of providing coverage under its Policy.

107.     While representing to its insured that it will diligently investigate business interruption claims connected to the COVID-19 pandemic, Cincinnati has told the investors the truth: that it will not honor such claims.

108.     Specifically in its 10-Q filing for Q1 2020, Cincinnati stated:

> Virtually all of our commercial property policies do not provide coverage for business interruption claims unless there is direct physical damage or loss to property. Because a virus does not produce direct physical damage or loss to property, no coverage exists for this peril – rendering an exclusion unnecessary. For this reason, most of our standard market commercial property policies in states where we actively write business do not contain a specific exclusion for COVID-19. While we will evaluate each claim based on the specific facts and circumstances involved, our commercial property policies do not provide coverage for business interruption claims unless there is a direct physical damage or loss to property.

109.     Consistent with this position, and while purporting to reserve its rights, Cincinnati provided a letter responding to Plaintiff's claims twice stating: "Your notice of claim indicates that

your claim involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises." Cincinnati's letter further demanded additional information prior to rending a coverage decision under the guise of conducting an investigation. But the 10-Q and Cincinnati's letter are the same. The only difference is that the 10-Q states outright what the letter implies: Cincinnati has no intention of paying out under the Policies.

110.     As the 10-Q and letters make clear, Cincinnati's premediated strategy to deny all COVID-19-related claims applies even where an insured expressly negotiated for virus coverage.

111.     Given Cincinnati's intention to issue categorical denials of all claims arising out of the COVID-19 pandemic, it is no surprise that Cincinnati failed to evaluate Plaintiff's claims based on all the information that could be gathered from a fair and neutral individualized investigation. Cincinnati further failed to review ample publicly-available and easily-accessible information regarding the claims, and failed to secure an outside counsel opinion on coverage to avoid bias. Cincinnati has made no request to visit or inspect any of the covered premises.

112.     Instead, Cincinnati asserts that it is Plaintiff's burden to show "certain key elements" of coverage to Cincinnati, and then demands that prior to rending a coverage decision, Plaintiff must expend the time and expense to supply information that is otherwise readily-available to Cincinnati.

113.     Cincinnati's letters further misstate Policy terms and engineer new post-hac requirements for coverage (including, for example, requiring "direct physical loss or direct physical damage … to property at the covered premises," rather than the requirement as stated in the Policy that "direct 'loss'" cause the *suspension*). Cincinnati's letters also quote at length numerous provisions from the Policy with no explanation.

114.     Plaintiff, on the other hand, satisfied all of its duties under the Policy and law.

115.     Cincinnati's repudiation of the Policy that Plaintiff purchased to protects its Restaurants and employees is unlawful. The governmental actions affecting Plaintiff's premises have caused a loss of income and increase in expenses, among other covered costs.  This risk – of governmental action – is nowhere limited or excluded in the Policies.

116.     Cincinnati is required under the Texas Insurance Code to conduct a timely investigation of Plaintiff's claims. Cincinnati has wholly failed to undertake this duty to investigate, and instead, has attempted to shift the burden to investigate on the Plaintiff.  Such a blatant disregard of its duties to conduct a good faith investigation within the permissible time frame constitutes bad faith under the Insurance Code.

117.     By denying Plaintiff's claim without inspecting the Restaurant premises, Cincinnati has waived any right to inspect the premises, deny coverage for any reason related to conditions at those locations, or raise any defense related to conditions at those locations or facts specific to the Restaurants.

118.     The nature of Cincinnati's denial of the Restaurants' claims and its lack of consideration given to the claim, indicate that Cincinnati could not have engaged in a good faith or reasonable investigation of the claims which included assessment of facts or issues relevant to the Restaurant.

119.     Cincinnati accepted the premiums paid by the Restaurants with no intention of providing lost business income, physical damage, civil authority or other applicable coverage for claims like those submitted by Plaintiff, and which were effectively denied by Cincinnati.

120.     Moreover, based upon Cincinnati's systematic, across-the-board denials of similar claims across the country were part of a premeditated strategy by Cincinnati to deny all claims

related to COVID-19 and the Closures orders. These denials were untethered to the facts of the claims, which Cincinnati did not adequately investigate, or the specific coverage provided, and were therefore unlawful.

121.     Cincinnati's rejection of the Restaurants' claims was part of a policy by Cincinnati to limit its losses during this pandemic, notwithstanding that the Policy provides coverage for losses due to loss of use of property and from COVID-19 orders issued by the civil authorities.

122.     Although industry trade groups have argued that insurance companies do not have funds to pay claims related to COVID-19 and will require government assistance, the reality is that insurers are simply trying to minimize their exposure. "According to data from ratings firms A.M. Best Co., the insurance industry as a whole has $18.4 billion in net reserves for future payouts."[7]

123.     Upon information and belief, Cincinnati collected well over a billion dollars in property insurance premiums in 2019 alone.[8]  Notwithstanding this, Cincinnati appears to be categorically denying claims brought by business ordered to close following COVID-19, including those brought by Plaintiff.  This deliberate strategy and common policy, and the insurance industry's public requests for government assistance, suggest strongly that their true goal is minimizing payments by any means necessary.

124.     Cincinnati's wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage to Plaintiff.

---

[7] Leslie Scism, "U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims," *Wall Street Journal* (March 6, 2020), *available at* https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668?mod=article_inline (last accessed May 4, 2020).

[8] National Association of Insurance Commissioners, "Property and Casualty Insurance Industry 2019 Top 25 Groups and Companies by Countrywide Premium," p. 5 https://www.naic.org/documents/web_market_share_ property_casualty.pdf?17 (last accessed August 31, 2020).

125.     As described above, the Restaurants suffered losses when COVID-19 and related government orders caused them to lose physical access to, use of, and operations at and by the Restaurants, their employees, and their customers. This includes, among other things, loss of the ability to welcome customers onto the Restaurants' physical premises, offer the physical dining experience of eating on site, access or utilize any of the physical property associated with these activities, access and utilize the ingresses and egresses at or to the restaurants or properties upon which they depend in order to generate income. As a result of the Orders, physical components of the Restaurants became unusable, untenantable, damaged, and/or lost the ability to generate income.

126.     As a direct result of this physical loss or damage, the Restaurants suspended operations, lost business income, and suffered other related covered losses (including but not limited to extended business income, lost inventory, and extra expenses). The extra expenses include (but are not limited to) outdoor seating and related equipment and protective equipment for employees.

127.     Plaintiff brings this lawsuit against Cincinnati for declaratory relief, breach of its contractual obligations under the all-risk commercial property insurance Policy to indemnify Plaintiff for business losses and extra expenses, and other related losses resulting from the actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 outbreak.

## V.     CAUSES OF ACTION

128.     All conditions precedent to this action have been performed, have been waived or are excused.

129.     The acts and omissions of Defendant described in the foregoing paragraphs give rise to the following causes of action:

**C**OUNT **1: D**ECLARATORY **& I**NJUNCTIVE **R**ELIEF **– B**USINESS **I**NCOME

130.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

131.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

132.     An actual controversy has arisen and now exists between Plaintiff and Cincinnati concerning the respective rights and duties of the parties under the Policy. Vandelay requested coverage for COVID-19 related losses as specified in the Policy. Cincinnati responded with a letter reserving its rights, but effectively denying coverage.  Moreover, upon information and belief, Cincinnati has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

133.     Plaintiff contends that Cincinnati has breached the Policy in the following respects:

   a.  Plaintiff suffered losses covered by the Business Income Coverage in the Policy;

   b.  Cincinnati is obligated to pay for those losses; and

   c.  Cincinnati has failed and refused to pay Vandelay for those losses.

134.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Cincinnati unlawful and in material breach of the Policy so that future controversies may be avoided.

135.     Pursuant to a declaration of the parties' respective rights and duties under the Policy, Plaintiff further seeks an injunction enjoining Cincinnati (1) from continuing to engage in conduct in breach of the Policy in regards to coverage decisions under the Policy's Business

Income Coverage; and (2) ordering Cincinnati to comply with the terms of the Policy in regards to coverage decisions.

## COUNT 2:  BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION – BUSINESS INCOME

136.       Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

137.       Vandelay and Cincinnati have a valid agreement.   Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

138.       Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due and giving Cincinnati notice of Plaintiff's claim.

139.       Plaintiff has sustained a loss under the Business Income Coverage in the Policy arising from the COVID-19 virus and associated state and local Stay at Home Orders.

140.       Cincinnati has refused to perform under the Policy. Specifically, Cincinnati has denied Plaintiff's claim for Business Income related to COVID-19, and associated state and local Stay at Home Orders, in breach of the Policy.

141.       As a result of Cincinnati's breach, repudiation or anticipatory breach, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT 3: DECLARATORY & INJUNCTIVE RELIEF – CIVIL AUTHORITY COVERAGE

142.       Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

143.       The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

144.       An actual controversy has arisen and now exists between Plaintiff and Cincinnati concerning the respective rights and duties of the parties under the Policy. Vandelay requested

coverage for COVID-19 related losses as specified in the Policy. Cincinnati responded with a letter reserving its rights, but effectively denying coverage.  Moreover, upon information and belief, Cincinnati has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

145.     Plaintiff contends that Cincinnati has breached the Policy in the following respects:

a.  Plaintiff suffered losses covered by the Policy's Civil Authority Coverage in the Policy;

b.  Cincinnati is obligated to pay for those losses; and

c.  Cincinnati has failed and refused to pay Vandelay for those losses.

146.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Cincinnati unlawful and in material breach of the Policy so that future controversies may be avoided.

147.     Pursuant to a declaration of the parties' respective rights and duties under the Policy, Plaintiff further seeks an injunction enjoining Cincinnati (1) from continuing to engage in conduct in breach of the Policy in regards to coverage decisions under the Policy's Civil Authority Coverage; and (2) ordering Cincinnati to comply with the terms of the Policy in regards to coverage decisions.

## COUNT 4: BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION – CIVIL AUTHORITY COVERAGE

148.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

149.     Vandelay and Cincinnati have a valid agreement. Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

150.     Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due and giving Cincinnati notice of Plaintiff's claim.

151.     Plaintiff has sustained a loss under the Civil Authority Coverage in the Policy arising from the COVID-19 virus and associated state and local Stay at Home Orders.

152.     Cincinnati has refused to perform under the Policy. Specifically, Cincinnati has denied Plaintiff's claim for Civil Authority Coverage related to COVID-19, and associated state and local Stay at Home Orders, in breach of the Policy.

153.     As a result of Cincinnati's breach, repudiation or anticipatory breach, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT 5:  DECLARATORY & INJUNCTIVE RELIEF – EXTRA EXPENSE COVERAGE

154.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

155.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

156.     An actual controversy has arisen and now exists between Plaintiff and Cincinnati concerning the respective rights and duties of the parties under the Policy. Vandelay requested coverage for COVID-19 related losses as specified in the Policy. Cincinnati responded with a letter reserving its rights, but effectively denying coverage.  Moreover, upon information and belief, Cincinnati has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

157.     Plaintiff contends that Cincinnati has breached the Policy in the following respects:

    a.  Plaintiff suffered losses covered by the Policy's Extra Expense Coverage in the Policy;

b. Cincinnati is obligated to pay for those losses; and

c. Cincinnati has failed and refused to pay Vandelay for those losses.

158.        Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Cincinnati unlawful and in material breach of the Policy so that future controversies may be avoided.

159.        Pursuant to a declaration of the parties' respective rights and duties under the Policy, Plaintiff further seeks an injunction enjoining Cincinnati (1) from continuing to engage in conduct in breach of the Policy in regards to coverage decisions under the Policy's Extra Expense Coverage; and (2) ordering Cincinnati to comply with the terms of the Policy in regards to coverage decisions.

## COUNT 6: BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION – EXTRA EXPENSE COVERAGE

160.        Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

161.        Vandelay and Cincinnati have a valid agreement.  Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

162.        Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due and giving Cincinnati notice of Plaintiff's claim.

163.        Plaintiff has sustained a loss under the Extra Expense Coverage in the Policy arising from the COVID-19 virus and associated state and local Stay at Home Orders.

164.        Cincinnati has refused to perform under the Policy. Specifically, Cincinnati has denied Plaintiff's claim for Extra Expense Coverage related to COVID-19, and associated state and local Stay at Home Orders, in breach of the Policy.

165.     As a result of Cincinnati's breach, repudiation or anticipatory breach, Plaintiff has sustained damages in an amount to be determined at trial.

**COUNT 7: DECLARATORY & INJUNCTIVE RELIEF – INGRESS AND EGRESS COVERAGE**

166.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

167.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

168.     An actual controversy has arisen and now exists between Plaintiff and Cincinnati concerning the respective rights and duties of the parties under the Policy. Vandelay requested coverage for COVID-19 related losses as specified in the Policy. Cincinnati responded with a letter reserving its rights, but effectively denying coverage.  Moreover, upon information and belief, Cincinnati has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

169.     Plaintiff contends that Cincinnati has breached the Policy in the following respects:

   a.  Plaintiff suffered losses covered by the Policy's Ingress and Egress Coverage in the Policy;

   b.  Cincinnati is obligated to pay for those losses; and

   c.  Cincinnati has failed and refused to pay Vandelay for those losses.

170.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Cincinnati unlawful and in material breach of the Policy so that future controversies may be avoided.

171.     Pursuant to a declaration of the parties' respective rights and duties under the Policy, Plaintiff further seeks an injunction enjoining Cincinnati (1) from continuing to engage in

conduct in breach of the Policy in regards to coverage decisions under the Policy's Ingress and Egress Coverage; and (2) ordering Cincinnati to comply with the terms of the Policy in regards to coverage decisions.

## COUNT 8: BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION – INGRESS AND EGRESS COVERAGE

172.    Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

173.    Vandelay and Cincinnati have a valid agreement. Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

174.    Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due and giving Cincinnati notice of Plaintiff's claim.

175.    Plaintiff has sustained a loss under the Ingress and Egress Coverage in the Policy arising from the COVID-19 virus and associated state and local Stay at Home Orders.

176.    Cincinnati has refused to perform under the Policy. Specifically, Cincinnati has denied Plaintiff's claim for Ingress and Egress Coverage related to COVID-19, and associated state and local Stay at Home Orders, in breach of the Policy.

177.    As a result of Cincinnati's breach, repudiation or anticipatory breach, Plaintiff has sustained damages in an amount to be determined at trial.

## COUNT 9: DECLARATORY & INJUNCTIVE RELIEF – DEPENDENT PROPERTY COVERAGE

178.    Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

179.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

180.     An actual controversy has arisen and now exists between Plaintiff and Cincinnati concerning the respective rights and duties of the parties under the Policy. Vandelay requested coverage for COVID-19 related losses as specified in the Policy. Cincinnati responded with a letter reserving its rights, but effectively denying coverage.  Moreover, upon information and belief, Cincinnati has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

181.     Plaintiff contends that Cincinnati has breached the Policy in the following respects:

a.  Plaintiff suffered losses covered by the Policy's Dependent Property Coverage in the Policy;

b.  Cincinnati is obligated to pay for those losses; and

c.  Cincinnati has failed and refused to pay Vandelay for those losses.

182.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Cincinnati unlawful and in material breach of the Policy so that future controversies may be avoided.

183.     Pursuant to a declaration of the parties' respective rights and duties under the Policy, Plaintiff further seeks an injunction enjoining Cincinnati (1) from continuing to engage in conduct in breach of the Policy in regards to coverage decisions under the Policy's Dependent Property Coverage; and (2) ordering Cincinnati to comply with the terms of the Policy in regards to coverage decisions.

## COUNT 10: BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION – DEPENDENT PROPERTY COVERAGE

184.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

185.      Vandelay and Cincinnati have a valid agreement.   Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

186.      Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due and giving Cincinnati notice of Plaintiff's claim.

187.      Plaintiff has sustained a loss under the Dependent Property Coverage in the Policy arising from the COVID-19 virus and associated state and local Stay at Home Orders.

188.      Cincinnati has refused to perform under the Policy. Specifically, Cincinnati has denied Plaintiff's claim for Dependent Property Coverage related to COVID-19, and associated state and local Stay at Home Orders, in breach of the Policy.

189.      As a result of Cincinnati's breach, repudiation or anticipatory breach, Plaintiff has sustained damages in an amount to be determined at trial.

### COUNT 11: DECLARATORY & INJUNCTIVE RELIEF – SUE AND LABOR COVERAGE

190.      Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

191.      The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

192.      An actual controversy has arisen and now exists between Plaintiff and Cincinnati concerning the respective rights and duties of the parties under the Policy. Vandelay requested coverage for COVID-19 related losses as specified in the Policy. Cincinnati responded with a letter reserving its rights, but effectively denying coverage.  Moreover, upon information and belief, Cincinnati has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

193.      Plaintiff contends that Cincinnati has breached the Policy in the following respects:

a.  Plaintiff suffered losses covered by the Policy's Sue and Labor Coverage in the Policy;

b.  Cincinnati is obligated to pay for those losses; and

c.  Cincinnati has failed and refused to pay Vandelay for those losses.

194.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Cincinnati unlawful and in material breach of the Policy so that future controversies may be avoided.

195.    Pursuant to a declaration of the parties' respective rights and duties under the Policy, Plaintiff further seeks an injunction enjoining Cincinnati (1) from continuing to engage in conduct in breach of the Policy in regards to coverage decisions under the Policy's Sue and Labor Coverage; and (2) ordering Cincinnati to comply with the terms of the Policy in regards to coverage decisions.

## COUNT 12: BREACH OF CONTRACT – ANTICIPATORY BREACH/REPUDIATION – SUE AND LABOR COVERAGE

196.    Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

197.    Vandelay and Cincinnati have a valid agreement.  Plaintiff has an all-risk commercial property insurance Policy No. ECP0495629 issued by Defendant Cincinnati.

198.    Plaintiff has performed all of its obligations as specified by the Policy, including the payments of all premiums due and giving Cincinnati notice of Plaintiff's claim.

199.    Plaintiff has sustained a loss under the Sue and Labor Coverage in the Policy arising from the COVID-19 virus and associated state and local Stay at Home Orders.

200.     Cincinnati has refused to perform under the Policy. Specifically, Cincinnati has denied Plaintiff's claim for Sue and Labor Coverage related to COVID-19, and associated state and local Stay at Home Orders, in breach of the Policy.

201.     As a result of Cincinnati's breach, repudiation or anticipatory breach, Plaintiff has sustained damages in an amount to be determined at trial.

**Count 13: Breach of Covenant of Good Faith and Fair Dealing**

202.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

203.     When Cincinnati entered into the Policy with Plaintiff, Cincinnati undertook and were bound to covenants, implied by law that it would deal fairly and in good faith with Plaintiff, and not engage in any acts, conduct, or omissions that would diminish the rights and benefits due Plaintiff or defeat the reasonable expectation of Plaintiff under its Policy with Cincinnati.

204.     By its conduct alleged herein, Cincinnati breached the implied covenant of good faith and fair dealing arising out of its Policy with Plaintiff including, but not limited to by (a) unreasonably and in bad faith effectively denying Plaintiff's insurance coverage to which it is entitled; (b) failing and refusing to perform a fair, objective, good faith and thorough investigation of the claim; (c) asserting coverage defenses that are legally and/or factually invalid, thereby denying resolution of Plaintiff's claim; and (d) placing unduly restrictive interpretations on the terms of its insurance Policy for the purpose of denying coverage due, including but not limited to refuting coverage and attempting to vary the term loss.

205.     Cincinnati's conduct appears to be nothing more than an attempt to put insured in a position where they will be forced to accept lowball settlement offers simply from the fear that their insurer will drag out proceedings well past the insured's ability to remain financially viable.

206.     On information and belief, Cincinnati's anticipated denial of coverage is based on an internal, high-level directive to automatically deny all pandemic-related business-interruption claims.  Cincinnati's reservation of rights and anticipated denial of coverage is unreasonable and reflects a failure to adequately and reasonably investigate and evaluate Plaintiff's claim, even though Cincinnati knew, or should have known by the exercise of reasonable diligence that its liability was reasonably clear under the circumstances.  For these reasons, Cincinnati's conduct described herein constitutes a breach of the duty of good faith and fair dealing.

207.     In committing its breaches, Cincinnati has acted with malice, shown a reckless and outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious indifference to Plaintiff's rights and welfare, thereby entitling Plaintiff to punitive and exemplary damages against Cincinnati. As a direct and proximate result of the above-referenced breach, Plaintiff has had to retain attorneys to enforce its rights to the insurance coverage to which it is entitled and has thereby injured and damaged.

208.     Plaintiff is therefore entitled to recover and seek in connection with this claim an award of general damages and other monetary damages, including al foreseeable consequential and incidental damages for diminution in value, loss of use, and other incidental damages and out-of-pocket expenses, plus interest, in an amount to be determined at trial; punitive and exemplary damages in amount to be determined at trial, costs of suit, and reasonable attorneys'' fees in connection with this action.

## Count 14: Violation of Texas Prompt Pay Act

209.     Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

210.        Cincinnati has failed to timely and promptly pay as required under Tex. Ins. Code §§ 542.055-542.059.  Despite Plaintiff's timely and proper submission of its claim to Cincinnati, Cincinnati did not: (1) make a reasonable or diligent determination of whether the claim was payable within 30 days of receipt; and (2) notify Plaintiff in writing why the claim would not be paid.

211.        Cincinnati failed to timely investigate Plaintiff's claim and request all information reasonably necessary to investigate Plaintiff's insurance claim within the statutorily mandated deadlines.  Cincinnati's conduct constitutes a violation of the Prompt Payment of Claims subchapter of the Texas Insurance Code. Tex. Ins. Code § 542.055.

212.        Cincinnati failed to accept or deny Plaintiff's insurance claim within the statutory mandated deadline of receiving the claim. Cincinnati's conduct constitutes a violation of the Prompt Payment of Claims subchapter of the Texas Insurance Code. Tex. Ins. Code § 542.056

213.        Cincinnati failed to meet its obligations under the Texas Insurance Code regarding payment of claims without delay. Specifically, Cincinnati has delayed payment of Plaintiff's insurance claim longer than allowed and, to date, Plaintiff has not yet received any payment for Plaintiff's insurance claim. Cincinnati's conduct constitutes a violation of the Prompt Payment of Claims subchapter of the Texas Insurance Code. Tex. Ins. Code § 542.058.

214.        Cincinnati should be ordered to pay "in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable and necessary attorney's fees. Nothing in this subsection prevents the award of prejudgment interest on the amount of the claim, as provided by law. Tex. Ins. Code § 542.060(a)

215.      Plaintiff was forced to retain the services of an attorney and law firm to represent it with respect to its claims against Cincinnati because of Cincinnati's wrongful acts or omissions. Tex. Ins. Code § 542.060(b).

**Count 15: Violation of Unfair Insurance Practices**

216.      Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

217.      The Texas Insurance Code Chapter 541 sets out Unfair Methods of Competition, Unfair or Deceptive Acts or Practices that insurance companies should not engage in, as well as Unfair Settlement Practices, which includes things like: misrepresenting a material fact or policy provision; failing to attempt in good faith to effect a prompt, fair and equitable settlement where the insurer's liability has become reasonably clear; failing to provide a policyholder with a reasonable explanation of why a claim was denied or offer of compromise; and refusing to pay a claim without conducting a reasonable investigation.

218.      Cincinnati has failed and continues to fail and refuse to meet its obligations under the Texas Insurance Code regarding payment of claims without delay due to its wrongful denial.

219.      Cincinnati failed to fairly evaluate and investigate Plaintiff's insurance claim, and is obligated to do so under the Policy and Texas law. By failing to properly investigate the insurance claim and wrongfully denying coverage and payment to Plaintiff, Cincinnati engaged in unfair insurance and settlement practices prohibited under Texas law.

220.      Cincinnati misrepresented to Plaintiff that its claim was not covered under the Policy even though such loss was a covered peril. Cincinnati's conduct constitutes a violation of the Unfair Settlement Practices section of the Texas Insurance Code. Tex. Ins. Code §541.060(a)(1).

221.        Cincinnati failed to make a good faith attempt to settle Plaintiff's insurance claim in a prompt, fair and equitable manner, although Cincinnati was aware of its liability to Plaintiff under the Policy. Cincinnati's conduct constitutes a violation of the Unfair Settlement Practices section of the Texas Insurance Code. Tex. Ins. Code § 541.060(a)(2)(A).

222.        Cincinnati failed to affirm or deny coverage of Plaintiff's insurance claim within a reasonable time.  Specifically, Plaintiff did not receive timely indication of acceptance or rejection regarding the full and entire claim, in writing from Cincinnati.  Cincinnati's conduct constitutes a violation of the Unfair Settlement Practices section of the Texas Insurance Code. Tex. Ins. Code § 541.060(a)(4).

223.        Cincinnati refused to compensate Plaintiff as required under the terms of the Policy and failed to conduct a reasonable investigation. Specifically, Cincinnati failed to inspect the premises or conduct any sort of reasonable investigation of Plaintiff's claim.  Cincinnati's conduct constitutes a violation of the Unfair Settlement Practices section of the Texas Insurance Code. Tex. Ins. Code § 541.060(a)(7)

224.        By its acts, omissions, failures and conduct, Cincinnati engaged in unfair and deceptive acts or practices in the business of insurance in violation of Chapter 541 of the Texas Insurance Code. Such violations include, without limitation, the following unfair insurance practices:

   a. Engaging in false, misleading and deceptive acts or practices in the business of insurance in this case. See generally Tex. Ins. Code. § 541, et. seq.

   b. Engaging in unfair claim settlement practices.  Tex. Ins. Code § 541.060

   c. Misrepresenting to Plaintiff the benefits under the Policy. Tex. Ins. Code § 541.051(1)(B);

d.  Misrepresenting to Plaintiff pertinent facts or policy provisions relating to the coverage at issue. Tex. Ins. Code § 541.060(a)(1);

e.  Not attempting in good faith to effectuate a prompt, fair and equitable settlement of claim submitted in which liability has become reasonably clear. Tex. Ins. Code § 541.060(a)(2)(A);

f.  Failing to affirm or deny coverage of Plaintiff's insurance claim within a reasonable time. Tex. Ins. Code § 541.060(a)(4); and

g.  Refusing to pay Plaintiff's claim without conducting a reasonable investigation with respect to the claim. Tex. Ins. Code § 541.060(a)(7).

225.    Cincinnati's conduct constitutes a violation of the Texas Insurance Code §542.057-58. Cincinnati's actions have damaged Vandelay in excess of the jurisdictional limits of this Court.

226.    Furthermore, for Cincinnati's noncompliance with the Texas Insurance Code, Unfair Settlement Practices, Vandelay is entitled to actual damages, which include the loss of the benefits that should have been paid pursuant to the Policy but for the wrongful denial, court costs, consequential damages not covered by Vandelay's Policy and attorney's fees. For knowing conduct of the acts described above, Vandelay seeks three (3) times the actual damages against Cincinnati. TEX. INS. CODE §541.152.

## VI.    ATTORNEYS' FEES

227.    Plaintiff is entitled to recover its court costs and attorneys' fees in accordance with TEX. CIV. PRAC. & REM. CODE § 38.001 and TEX. INS. CODE §542.060

## VII.    EXEMPLARY DAMAGES

228.    Plaintiff Vandelay re-alleges each and every paragraph as though they are set forth fully herein.

229.     The acts of Cincinnati complained of herein were committed knowingly, willfully, intentionally, with actual awareness, or with actual malice.  In order to punish Cincinnati for such unconscionable overreaching and to deter such actions and/or omissions in the future, Vandelay seeks recovery from Cincinnati of exemplary damages as provided by Chapter 41 of the Texas Civil Practice and Remedies Code and TEX. INS. CODE §542.060.

## NO WAIVER

230.     By filing this lawsuit, Vandelay does not waive or release any rights, claims, causes of action, or defenses or make any election of remedies that it has, but expressly reserve such rights, claims, causes of action and defenses.

## CONDITIONS PRECEDENT

231.     All conditions precedent to Vandelay's right to recovery has been performed, have occurred, and/or have been waived.

## REQUEST FOR RELIEF

WHEREFORE, Vandelay Hospitality Group LP requests that declaratory judgment be entered in Plaintiff's favor as stated herein, and that Plaintiff have judgment against Defendant The Cincinnati Insurance Company for all actual, consequential and special damages, as  well as exemplary damages, and that the Plaintiff recover its attorney's fees, costs of court, and all such other relief, general or special, legal or equitable, to which Plaintiff may show itself justly entitled.

Dated: November 4, 2020

Dated:

Respectfully submitted,
**FRIEDMAN & FEIGER, L.L.P.**

*/s/ Shauna A. Izadi*

**SHAUNA A. IZADI**
State Bar No. 24041170
Email: sizadi@fflawoffice.com
**JASON H. FRIEDMAN**
State Bar No. 24059784
Email: jason@fflawoffice.com
**KAITLYN COKER**
State Bar No. 24115264
Email: kbeaman@fflawoffice.com
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties who have appeared and registered with CM/ECF.

*/s/ Shauna A. Izadi*
Shauna A. Izadi